1  **WO**

6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Michael Ray White, | ) | No.  CV-08-08139-PCT-SPL |
| | ) | |
| Petitioner, | ) | **ORDER** |
| | ) | |
| vs. | ) | (Death Penalty Case) |
| | ) | |
| Charles L. Ryan, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

        Before the Court are Petitioner's Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 273) and Motion for Evidentiary Development (Doc. 277), which are fully briefed. For the reasons that follow, the Court concludes that Petitioner is not entitled to relief, and will deny his petition.

**I.      Background**

        **A.      State Proceedings**

        In 1988, a jury convicted Petitioner of first-degree murder and conspiracy to commit first-degree murder. The trial court sentenced him to life without possibility of parole for 25 years for the conspiracy and imposed the death penalty for the first-degree murder. The Arizona Supreme Court affirmed. *State v. White (White I)*, 168 Ariz. 500, 815 P.2d 869 (1991).

        In 1992, Petitioner filed a petition for post-conviction relief ("PCR"). He filed an amended petition in 1995. The trial court granted Petitioner a new sentencing on grounds of ineffective assistance of counsel during the initial sentencing proceedings. On

resentencing, Petitioner again received a life sentence without possibility of parole for 25 years for the conspiracy and a death sentence for the murder. The Arizona Supreme Court again affirmed. *State v. White (White II)*, 194 Ariz. 344, 347–49, 982 P.2d 819, 822–24 (1999). Except where otherwise indicated, the following factual summary is taken from *White II*.

At approximately 11 p.m. on December 12, 1987, neighbors of David and Susan Johnson (David and Susan) heard gunshots at the Johnson residence in Bagdad, Arizona. Neighbors saw a man run from the residence, enter a green car, and speed away. David walked to a neighbor's home and collapsed. He had been shot in the chin and in the back with a .357 magnum revolver. Before dying, David identified the shooter as a man wearing a mask.

The police investigation soon focused on Petitioner and Susan. Police learned that Petitioner met Susan in January 1987, when the two worked at a nursing home in Prescott, Arizona. In April 1987, the couple went to Michigan. Susan returned to Prescott the following October and married David. Petitioner also returned and resumed his affair with Susan.

On November 25, 1987, Susan obtained a $65,000 life insurance policy on David. Susan was the named beneficiary. There was also a change of beneficiary in David's existing employee group life insurance. Susan obtained the change form on December 7, 1987, and returned it fully executed on December 10, two days before the murder. The form added Susan and her children as beneficiaries.

Petitioner told several people that Susan had asked him to kill David. He also told his ex-wife that he was soon going to receive $100,000.

The police learned that Petitioner made a down payment on a revolver at a Prescott pawn shop on November 19, 1987. He later made another payment and picked up the gun. After David was shot, Petitioner sold the revolver to a Phoenix pawn shop. It was later recovered and identified as the weapon used to kill David. Petitioner's car was also identified as the green vehicle driven from the murder scene.

1    Petitioner was arrested in Phoenix on December 19, 1987. Police searched the car

2    and found a box of .38 caliber bullets, a ski mask, and a bag of potatoes. At the time of

3    the shooting, the killer had placed a potato over the barrel of the revolver to act as a

4    silencer. Pieces of dried potato were found at the crime scene, and potato starch was

5    found on the gun barrel.

6    Petitioner's trial was severed from Susan's. Petitioner was represented by attorney

7    Chester Lockwood.

8    The jury convicted Petitioner on both the conspiracy and murder counts. At the

9    presentencing hearing, the State argued that the crime was motivated by Petitioner's

10   intent to benefit from the insurance proceeds on the victim's life. Petitioner contended

11   that the evidence did not establish that his involvement in the killing was for financial

12   gain. The court disagreed and found that the State had proved the pecuniary gain

13   aggravating factor.

14   Petitioner presented no evidence of mitigation but argued that the absence of a

15   prior criminal record was a mitigating circumstance. The trial court also considered the

16   following facts in mitigation: Petitioner's natural father left home when Petitioner was 18

17   months old, his first stepfather was an alcoholic, and he was raised by his mother;

18   Petitioner had dependent personality traits and admitted to past heroin, cocaine, and

19   amphetamine use and addiction; Petitioner was unable to form and maintain close

20   personal relationships; although he generally had difficulty acting responsibly, Petitioner

21   did well in his nursing home employment and had been a productive person during

22   various periods of his life; he had no prior record of abuse or violent behavior; and he

23   expressed sorrow for David's death. The court found these circumstances insufficient to

24   call for leniency and sentenced Petitioner to death for David's murder. (SER 24.)[1] The

25   Arizona Supreme Court affirmed on direct appeal. *White I*, 168 Ariz. 500, 815 P.2d 869.

26   Susan Johnson was subsequently convicted of conspiracy to commit first-degree

27

28   _____
     [1]    "SER" stands for Supplemental Excerpts of Record, attached to Respondents'
     Answer. (*See* Doc. 275, Attachments 1 and 2.)

3

murder and first-degree murder. She received consecutive life sentences.[2]

Petitioner returned to the trial court for PCR proceedings. He was represented by Douglas McVay, who filed a PCR petition alleging numerous grounds of ineffectiveness of counsel at trial and sentencing. The court granted the petition on the sentencing claims and ordered a new mitigation hearing and sentencing proceeding. McVay also represented Petitioner at resentencing and on direct appeal from the resentencing.

At the resentencing hearing in August 1996, the prosecution offered no new evidence of aggravation. McVay presented evidence that the prosecutors at Petitioner's first trial and sentencing believed the State should not have sought the death penalty. (RT 8/27/96.)[3]

McVay proffered other mitigating circumstances. He argued that Petitioner was capable of being rehabilitated; that he was an involved parent to his daughter; that co-defendant Susan Johnson was the "mastermind" behind the crimes and therefore Petitioner's death sentence was unfair and disproportionate to Johnson's sentence; and the murder represented "aberrant behavior" for Petitioner. (SER 122–32.)

The trial court again found the pecuniary gain aggravating factor had been proven. (SER 138.) The court considered the mitigating factors urged by Petitioner but found them insufficient to call for leniency. (SER 139–45.)

On direct appeal the Arizona Supreme Court again affirmed:

> Based on our independent review of the sentence imposed on the defendant we conclude that the state has proved beyond a reasonable doubt the aggravating circumstance that Michael Ray White murdered David Johnson in anticipation of substantial pecuniary gain. We further conclude, in view of the calculated scheme which resulted in Johnson's death, that the mitigating factors raised by the defendant and discussed in this opinion, whether viewed individually or cumulatively, are insufficient to warrant a mitigation of sentence. They neither outweigh nor are they equal to the statutory aggravating circumstance present in this case. Defendant's capital sentence is therefore affirmed.

---

[2]    Judge James Hancock, of the Yavapai County Superior Court, presided over Petitioner's trial, sentencing, and resentencing, and PCR proceedings. He also presided over Susan Johnson's trial.

[3]    "RT" refers to the court reporter's transcript.

*White II*, 194 Ariz. at 356, 982 P.2d at 831.

Petitioner, represented by new counsel, returned to the trial court for another round of PCR proceedings, this time alleging that McVay had performed ineffectively at resentencing by failing to adequately investigate Petitioner's mental health issues. (*See* SER 247.) Petitioner filed an amended PCR petition on May 2, 2005. (PR doc. 7, Ex. F.)[4]

The court held an evidentiary hearing on November 5, 2007. Petitioner was represented by attorney Kerrie Droban. Two witnesses testified on Petitioner's behalf, counsel McVay and Keith Rohman, a mitigation specialist. (RT 11/5/07.) McVay acknowledged that he did not attempt to secure Petitioner's medical or psychological records. (*Id.* at 29, 50–51.) Rohman testified about Petitioner's physical and mental illnesses and other information gained in his mitigation investigation. (*Id.* at 92–93, 146.)

The court denied relief. (SER 271.) The court found that McVay did not perform deficiently at resentencing under prevailing professional norms and that Petitioner was not prejudiced. (*Id.*)

Droban filed a petition for review in the Arizona Supreme Court raising two issues: that McVay failed to contest the pecuniary gain aggravating factor and failed to conduct a mitigation investigation concerning Petitioner's "mental health, social history, and atrocious childhood." (SER 273–74.) The Supreme Court denied the petition without comment on October 28, 2008, and issued a warrant for Petitioner's execution. (SER 293.)

### B.   Federal Proceedings

Petitioner filed a motion for stay of execution, a motion for appointment of federal habeas counsel, and a statement of intent to file a federal habeas petition in this Court. (Docs. 1–5.) On October 29, 2008, the Court issued a stay of execution and appointed the Federal Public Defender's Office to represent Petitioner in his federal habeas proceedings, with Droban serving as co-counsel. (Docs. 7, 8.)

---

[4]   "PR doc." refers to documents filed with the Arizona Supreme Court in connection with Petitioner's petition for review from the denial of post-conviction relief in his second PCR proceedings (Case No. CR-08-0103-PC).

The initial petition for writ of habeas corpus was filed on December 22, 2008. (Doc. 23.) The Court ordered Petitioner to submit an amended petition no later than July 17, 2009. (Doc. 35.) Petitioner's counsel sought additional time to file the amended petition, raising concerns about Petitioner's competency pursuant to *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003).[5] (Doc. 42.) On September 23, 2009, counsel filed a motion to determine competency and to stay the habeas proceedings, which the Court granted. (Docs. 66, 68.)

Petitioner was evaluated by a court-appointed expert and experts for the parties. On September 28, 2010, the parties stipulated that Petitioner was incompetent, and the Court ordered the parties to file a joint report regarding restoration. (Doc. 186.) The parties filed their joint report (Doc. 187), and upon order of the Court Petitioner was transferred to the Arizona State Hospital ("ASH") for determination of a restoration plan. (Docs. 190, 196).

The parties then briefed issues related to forcibly medicating Petitioner and whether *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), affected Petitioner's competency litigation. (Docs. 211, 212, 215, 220, 224, 225.) After being informed of a conflict between ASH and the Arizona Department of Corrections about responsibility for Petitioner's treatment, the Court issued an order vacating its previously set hearing regarding forcible medication and ordered Respondents to file monthly status updates. (Doc. 226.)

In January 2013, the Supreme Court issued its opinion in *Ryan v. Gonzales*, 133 S. Ct. 696 (2013), abrogating *Rohan*. This Court lifted the stay and ordered Petitioner to file an amended petition. The amended petition was filed July 19, 2013. (Doc. 273.)

## II.    Standard of Review

Federal habeas claims are analyzed under the framework of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Pursuant to 28 U.S.C. § 2254(d), a petitioner is

---

[5]    In *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), *abrogated by Ryan v. Gonzales*, 133 S. Ct. 696 (2013), the Ninth Circuit held that a state prisoner sentenced to death had a statutory right to competence during his federal habeas proceedings.

not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court clarified that under § 2254(d), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101. Accordingly, to obtain habeas relief from this Court, Petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see Frost v. Pryor*, 749 F.3d 1212, 1225 -1226 (10th Cir. 2014) ("[I]f all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable . . . If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.").

With respect to § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546

U.S. 333, 341–342 (2006); *see Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (explaining that on habeas review a court cannot find the state court made an unreasonable determination of the facts simply because it would reverse in similar circumstances if the case came before it on direct appeal).

As the Ninth Circuit has explained, to find that a factual determination is unreasonable under § 2254(d)(2), the court must be "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). "This is a daunting standard—one that will be satisfied in relatively few cases." *Id.*

Significantly, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398 (holding that "the record under review is limited to the record in existence at that same time, *i.e.* the record before the state court"); *see Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (2013) (citing § 2254(d)(2) and *Pinholster*, 131 S. Ct. at 1400 n.7). Therefore, as the court explained in *Gulbrandson*:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Id.* at 993–94.

The relevant state court decision is the last reasoned state decision regarding a

8

1   claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.*
2   *Nunnemaker*, 501 U.S. 797, 803–04 (1991)).

3   **III.   Discussion**

4       The amended habeas petition raises 28 claims,[6] along with numerous subclaims.
5   (Doc. 273.) In his motion for evidentiary development Petitioner seeks expansion of the
6   record, discovery, and an evidentiary hearing on two of the claims: Claim 1, alleging
7   ineffective assistance of counsel at resentencing, and Claim 15, alleging ineffective
8   assistance of trial counsel. (Doc. 277.)

9       **A.   Claim 1**

10      Petitioner alleges that McVay performed at a constitutionally ineffective level
11  during resentencing. (Doc. 273 at 40.) He alleges that McVay performed ineffectively by
12  failing to challenge the pecuniary gain aggravating factor (*id.* at 42–50) and by failing to
13  investigate and present mitigation evidence at Petitioner's resentencing hearing. (*Id.* at
14  50–82.) Petitioner raised these allegations in his second PCR petition, and the court
15  rejected them. Petitioner contends that the state court's decision constituted an
16  unreasonable application of clearly established federal law and was based on an
17  unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1) and (2). (*See id.* at
18  42, 50.)

19      In support of this claim, Petitioner seeks expansion of the record and an
20  evidentiary hearing. (Doc. 277 at 20–29.) The evidence Petitioner now seeks to present
21  includes the opinions of several mental health experts, which Petitioner contends should
22  have been presented by McVay at resentencing. (*Id.*) Respondents argue that evidentiary
23  development is foreclosed under *Pinholster* because the state court addressed the claim
24  on the merits. (Doc. 278 at 4–7.)

25      Petitioner counters that *Pinholster* does not limit the Court's ability to allow
26  evidentiary development of claims that were not fully developed in state court despite his

27
28  ---
    [6]     Petitioner has withdrawn twenty-three of the claims raised in his initial petition.
    (*See* Doc. 273 at 44-45.) For consistency's sake, the Court refers to the claims as
    numbered by Petitioner in the amended petition.

9

diligence. (Doc. 277 at 2.) He argues that "*Pinholster* cannot be interpreted to prevent evidentiary development of claims made by diligent petitioners whose attempts at factual development in state court were thwarted by the state court itself." (Doc. 279 at 3.) In arguing that he was denied an opportunity to "fully develop" his claims, Petitioner cites the state court's denial of his motion seeking the appointment of mental health experts during the second PCR proceedings. Petitioner's argument is not supported by *Pinholster* or subsequent cases.

"While allowing a petitioner to supplement an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* [*v. Richter*] precludes it." *Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013); *see Atkins v. Clarke*, 642 F.3d 47, 49 (1st Cir. 2011) (rejecting argument that a state court did not adjudicate claim on the merits unless petitioner was afforded a "full and fair evidentiary hearing"); *see also Donaldson v. Booker*, 505 Fed.Appx. 488, 493 (6th Cir. 2012) (rejecting argument that *Pinholster* does not apply in cases where "petitioner requested an evidentiary hearing in state court and was thereby not at fault for failure to develop the factual record in state court"); *Taylor v. Simpson*, No. 06-CV-181-JBC, 2012 WL 404929, at *3 (E.D. Ky. February 6, 2012) (rejecting argument that "*Pinholster* addressed only a fully developed claim, adjudicated on the merits in state court"); *Lewis v. Ayers*, No. 02-13-KJM-GGH-DP, 2011 WL 2260784, at *5-6 (E.D.Cal. June 7, 2011) ("Nor will an assertion—that because the state record was incomplete, there was no adjudication on the merits—operate to avoid the [*Pinholster*] holding. An adjudication on the merits is just that regardless of one's view on the completeness of the record on which the ruling was made.").

Petitioner further contends that *Pinholster* does not preclude the consideration of new evidence because the claim "satisfies" § 2254(d). (Doc. 279 at 2, 4–5.) Petitioner is correct that *Pinholster* does not bar evidentiary development where the court has determined, based solely on the state court record, that the petitioner "has cleared the § 2254(d) hurdle." *Madison v. Commissioner, Alabama Dept. of Corrections*, 761 F.3d

1240, 1249–50 (11th Cir. 2014); *see Pinholster*, 131 S. Ct. at 1400–01; *Henry v. Ryan*, 720 F.3d 1073, 1093 n.15 (9th Cir. 2013) (explaining that *Pinholster* bars evidentiary hearing unless petitioner satisfies § 2254(d)).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668, 674 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes,* 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook,* 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

With respect to *Strickland*'s second prong, a defendant must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. 788. As the Court explained in *Richter*:

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." [*Strickland*, 466 U.S.] at 689. The question is whether an attorney's

11

representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. [*Id.*] at 690.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

131 S. Ct. at 788 (additional citations omitted).

### 1.      Claim 1(A)

Petitioner alleges that McVay performed ineffectively at resentencing by failing to challenge the sole aggravating factor, pecuniary gain. (Doc. 273 at 42.) Petitioner raised this claim in his second PCR proceedings, and the court denied it. (SER 256–57.) Petitioner contends that the court's decision was an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts. (Doc. 273 at 43–44.)

The PCR court found that McVay's performance was not deficient and that Petitioner was not prejudiced. (SER 257.) The court noted that the pecuniary gain factor was proven at trial and upheld on independent review by the Arizona Supreme Court in *White I.* (SER 256.) The court further noted McVay's testimony at the evidentiary hearing that *White I* influenced his decision not to challenge the factor at resentencing. (*Id.*; *see* RT 11/5/07 at 65.) The court concluded that McVay "acted as a reasonable lawyer under the circumstances" and his decision not to challenge the aggravating factor was "based on sound trial strategy." (*Id.*) The court also found "[t]here was no reasonable probability that this Court would not have found the aggravator proven had McVay challenged it."[7] (SER 256.)

---

[7]      In the PCR court's order, counsel's name is spelled "McVey." This Court will use the correct spelling when quoting from the order.

In reaching these conclusions the court took into account the evidence Petitioner contends should have been presented at resentencing. (SER 255.) This evidence included statements Susan made in a police interview suggesting that Petitioner did not expect to receive a portion of the insurance proceeds and that Petitioner killed David Johnson because David had abused Susan. (*Id.*) The evidence also included statements other witnesses made to the police indicating that the insurance policy was not yet in effect or that only Johnson's children were its beneficiaries. (*Id.*)

The court also explained that pecuniary gain did not have to be the sole motivation for the murder in order for the factor to be satisfied. (SER 256.) Finally, the court concluded that the new evidence presented by PCR counsel would not have changed his decision about the aggravating factor. (*Id.*)

The PCR court did not unreasonably apply *Strickland* or make an unreasonable determination of the facts. In finding that McVay acted reasonably under the circumstances of the case, the court cited *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *overruled on other grounds,* 525 U.S. 141 (1998). In *Coleman* the Ninth Circuit reiterated that the review of counsel's performance is "extremely limited":

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.

150 F.3d at 1113 (additional citations omitted).

A reasonable lawyer could have acted as McVay did. Prior to the resentencing proceedings the Arizona Supreme Court had upheld the pecuniary gain aggravating factor. Moreover, the PCR court granted relief on the PCR petition only "for a mitigation hearing and new sentencing." (SER 121.) Under these circumstances, "some reasonable lawyer" could decide, as McVay did, not to challenge the pecuniary gain factor but to focus instead on mitigation. (*See* RT 11/5/07 at 65.)

Petitioner contends that the PCR court made an unreasonable determination of the

facts when it assessed the evidence relating to the pecuniary gain factor. The PCR court found that Susan Johnson's statements to the police were "contradicted" by her subsequent trial testimony, which indicated that Petitioner was aware of the insurance policies, repeatedly questioned Susan about them, and assumed that Susan would receive the proceeds and share them with him. (SER 256.) Petitioner asserts that this factual determination is unreasonable because the PCR court "made no findings . . . about how it chose which statements made by Susan it considered credible." (Doc. 273 at 46.)

This criticism of the PCR court's analysis fall far short of satisfying § 2254 (d)(2). "[S]tate courts are not required to address every jot and tittle of proof suggested to them, nor need they 'make detailed findings addressing all the evidence before [them].'" *Taylor*, 366 F.3d at 1001 (quoting *Miller–El*, 537 U.S. at 347). The PCR court did not ignore or overlook any highly probative evidence. *Id.* The fact that Petitioner disagrees with the PCR court's assessment of the evidence does not render the court's decision unreasonable. *Rice v. Collins*, 546 U.S. at 341–42.

The PCR court's finding that Petitioner was not prejudiced is also reasonable. The most significant proffered evidence in support of this claim are the statements contained in Susan Johnson's police interview. That report was admitted into evidence during the suppression hearing before Petitioner's trial (SER 13), and therefore was before the court at Petitioner's sentencing and resentencing. McVay's failure to proffer them at resentencing did not prejudice Petitioner.

In addition, the judge in the PCR proceedings, Judge James Hancock, also presided over Petitioner's trial and sentencing. His familiarity with the record provides the Court an additional reason to extend deference to his ruling. *See Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998). As the Ninth Circuit explained in *Smith*, when the judge who presided at the post-conviction proceeding was also the trial and sentencing judge, the reviewing court is considerably less inclined to order relief because doing so "might at least approach 'a looking-glass exercise in folly.'" *Id.* (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)); *see Schurz v. Ryan*, 730 F.3d 812, 816 (9th Cir.

14

2013) ("We are particularly confident in so concluding [that Schurz was not prejudiced by counsel's performance at sentencing] in light of the fact that the judge who sentenced Schurz already reviewed much of the 'new' evidence through the state post-conviction process, and found it insufficient to change the sentence from death.").

### 2.      Claim 1(B)

Petitioner alleges that McVay was ineffective at resentencing because he failed to investigate and present substantial and readily-available mitigation evidence. (Doc. 273 at 40.) Petitioner raised this claim during the PCR proceedings following resentencing, and the PCR court denied it.  Petitioner contends that the PCR court's denial of the claim was based on an unreasonable determination of the facts and constituted an unreasonable application of Strickland. (Doc. 273 at 50.) The Court disagrees.

### (a)      Facts

At the resentencing hearing McVay presented the testimony of Marc Hammond, the attorney who prosecuted Petitioner in the first trial and sentencing. Hammond testified that he believed the State should not have sought the death penalty because the case was a "run of the mill" murder and did not belong in the same category as other capital murders. (RT 8/27/96 at 15.) Hammond's co-counsel, Jill Lynch, agreed. (*Id.* at 18.) In arguing for the death penalty at trial, Hammond was following the policy of his office. (*Id.* at 15.) Hammond also testified that he believed Susan Johnson was the instigator of the plot and convinced Petitioner to go through with the murder. (*Id.* at 17.)

McVay submitted a sentencing memorandum that proffered other mitigating circumstances. (SER 122.) He emphasized that Petitioner was capable of being rehabilitated, based on his lack of a prior record of violence, his periods of productive employment, and his performance as a "model inmate." (SER 126–28.) McVay noted that Petitioner had been in contact with some of his children and was able to provide parental advice and guidance. (SER 129.) He contended that co-defendant Susan Johnson was the "mastermind" behind the crimes and pushed Petitioner into committing the murder, and that Petitioner's death sentence was unfair and disproportionate to Johnson's

sentence given their respective roles in the crimes. (SER 128–31.) Finally, McVay argued that the murder represented "aberrant behavior" for Petitioner given the absence of violent or abusive conduct in his record. (SER 131–32.)

Petitioner filed a *pro se* sentencing memorandum alleging that he was being tortured by personnel from the Department of Corrections who had inserted "biotelemetry implants" into his brain. (PR doc. 7, Ex. C.) Petitioner also stated that he suffered from Graves' disease, which reduced his life expectancy. (*Id.*)

The trial court again sentenced Petitioner to death, and the Arizona Supreme Court affirmed. Petitioner then returned to the trial court for a second round of PCR proceedings, this time alleging that McVay performed ineffectively at resentencing. (*See* SER 247.) In 2001, the PCR court appointed an investigator and a mitigation expert, Mary Durand. (*Id.*) Durand withdrew and was replaced by Keith Rohman in 2003. (*Id.*) The court denied PCR counsel's request for the appointment of a neuropsychologist and other experts. However, the court granted Petitioner's motion for an expert to determine if Petitioner was mentally retarded under *Atkins v. Virginia*, 536 U.S. 304 (2002). The court appointed Dr. Anne Herring, who scored Petitioner with a full scale IQ of 91 and concluded that he was of average general intelligence. (SER 162–64.)

Petitioner filed an amended PCR petition on May 2, 2005. (PR doc. 7, Ex. F.) He argued that McVay performed ineffectively by failing to investigate and present evidence of Petitioner's mental health problems. He also identified a number of other alleged deficiencies, arguing that McVay failed to adequately investigate and present evidence that Petitioner suffered from Graves' disease/hyperthyroidism; had borderline intellectual functioning and low intelligence; was the product of a multi-generational history of violence and criminality, alcoholism, and substance abuse; experienced an abusive childhood and unstable home-life; suffered serious head injuries and childhood seizures; suffered from Attention Deficit Hyperactivity Disorder and anxiety disorder during childhood and at the time of the crime; lived in poverty and was unable to support himself; was emotionally and psychologically unable to maintain relationships; and was a

model prisoner who adjusted to prison life and could be rehabilitated.

Attached to the PCR petition was a declaration from mitigation specialist Rohman, which included a 70-page "psycho-social history" of Petitioner and a 70-page "social history chronology." (PR doc. 3.) Rohman explained that he believed Petitioner displayed "strong indications of mental and physical illnesses," but acknowledged that he was not qualified to make such diagnoses. (*Id.* at 3.) Rohman stated that a complete picture of Petitioner's psychological and social makeup was impossible to construct without the assistance of relevant experts. (*Id.*)

The court held an evidentiary hearing on November 5, 2007. Petitioner presented two witnesses, counsel McVay and mitigation specialist Rohman. (RT 11/5/07.) McVay testified that during the resentencing proceedings he had retained an investigator to compile mitigation evidence. (*Id.* at 61–62.) He acknowledged, however, that he did not attempt to secure Petitioner's prison medical or psychological records. (*Id.* at 29, 50–51.) McVay denied that he was "on notice" of Petitioner's mental health issues, despite having received letters from Petitioner complaining of brain implants. (*Id.* at 28.) McVay testified that from his conversations with Petitioner, he did not "believe there was a founded basis" for requesting Petitioner's records from the Arizona Department of Corrections. (*Id.* at 29.)  He testified that he was skeptical, based on his face-to-face meetings with Petitioner during which Petitioner "seemed mostly rational," that Petitioner "genuinely believe[d] that he had implants inserted in his body" as described in his letters. (*Id.* at 64.)

Petitioner's medical records showed he had been diagnosed with Graves' disease and exhibited mental impairments such as paranoia and hallucinations, possibly related to the disease. (*Id.* at 32–33.) McVay conceded that he did not have a strategic basis for failing to review the records, and that if he had known of their contents he would have pursued the issue of Petitioner's mental health. (*Id.* at 42, 51.)

McVay testified that the choices he made in representing Petitioner were based on his conversations with Petitioner, his familiarity with the facts of the case, and

information he received from his investigator. (*Id.* at 58.) McVay testified that in his judgment the "most compelling" mitigating information was the prosecutors' opinion that the death penalty should not have been sought in Petitioner's case. (*Id.* at 66.) He felt this circumstance "was very compelling because it was so unusual." (*Id.*)

Rohman testified about his mitigation investigation. He explained that in the course of his investigation he interviewed Petitioner's relatives and secured school records and records from the Department of Corrections. (*Id.* at 81, 121.) The records showed that Petitioner was diagnosed with hyperthyroidism and Graves' disease in 1988 and diagnosed with schizophrenia in 1999, and he reportedly experienced visual and auditory hallucinations and paranoia dating from 1988. (*Id.* at 83, 119.) Rohman testified that the medical literature he reviewed identified a link between Graves' disease and mental illness. (*Id.* at 92.) Rohman also testified that Petitioner's school records showed he suffered from symptoms consistent with ADHD. (*Id.* at 121.) Petitioner coped with these conditions by using marijuana on nearly a daily basis from the age of 18. (*Id.* at 121.)  The records also showed an IQ test from Petitioner's childhood on which he scored a 74. (*Id.* at 102.)

Rohman admitted that he was not qualified to offer an opinion on whether Petitioner suffered from any of these conditions at the time of the crimes. (*Id.* at 92–93, 146.) He stated that a competent attorney would have retained a psychologist and a medical doctor to examine Petitioner during resentencing. (*Id.* at 96.)

Following the hearing the PCR court denied relief in a 30-page order. (SER 241–71.) Judge Hancock found that McVay did not perform deficiently under prevailing professional standards and that Petitioner was not prejudiced. (*Id.*)

### (b)    Analysis

Petitioner contends that the PCR court's denial of the claim was based on an unreasonable determination of the facts and constituted an unreasonable application of *Strickland*. (Doc. 273 at 50.) The Court agrees.

### i.      Determination of Facts

Petitioner makes several arguments in support of his allegation that the PCR court's denial of this claim was based on an unreasonable application of the facts, thereby satisfying § 2254(d)(2). First, citing *Taylor v. Maddox*, 366 F.3d 992, Petitioner contends that the PCR court's denial of funding for a neuropsychologist and other experts led to a defective fact-finding process and thus rendered the court's decision unreasonable. (Doc. 273 at 64–65; Doc. 275 at 15.)

In *Taylor,* the Ninth Circuit identified a number of procedural flaws which presumptively result in unreasonable factual determinations in state court, including when "the fact-finding process itself is defective," such as when a state court "makes evidentiary findings without holding a hearing," misapprehends or misstates a material fact, or ignores evidence that supports the petitioner's claim. 366 F.3d at 1001. The Ninth Circuit has cautioned, however, that "[t]o find the state court's fact finding process defective in a material way, or, perhaps, completely lacking, 'we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Hurles*, 752 F.3d at 778 (quoting *Taylor*, 366 F.3d at 1000).

Neither the PCR court's factual findings nor its fact-finding process were unreasonable or defective to a degree that would satisfy § 2254(d)(2). The court appointed an investigator and a mitigation expert. The latter compiled records, interviewed witnesses, and prepared a comprehensive report documenting Petitioner's social history and mental health issues. The court also granted Petitioner's motion for the appointment of an expert to determine whether Petitioner was mentally retarded. Finally, the court held an evidentiary hearing. After the hearing Judge Hancock issued detailed findings of fact addressing Petitioner's allegation that McVay performed ineffectively at sentencing.

The court's failure to appoint a neuropsychologist did not constitute a defect so

19

1    material that no reviewing court could hold that the fact-finding process was adequate.

2    The court found that Petitioner "did not make the showing necessary to obtain a

3    neuropsychologist." The court cited *Ake v. Oklahoma*, 470 U.S. 68, 82–83 (1985), which

4    holds that a defendant is constitutionally entitled to a mental health expert upon a

5    "threshold showing . . . that his sanity is likely to be a significant factor in his defense."

6    Noting the calculated nature of the crimes, the court found that Petitioner "failed to show

7    that any impairment would carry significant weight in mitigation and failed to show that

8    impairment as alleged would play a significant role in his defense against the death

9    penalty." (SER 251.) The court's application of *Ake* to deny funding for a

10   neuropsychologist did not render the fact-finding process defective. The court granted an

11   evidentiary hearing on Petitioner's ineffective assistance of counsel claim and appointed

12   a mitigation specialist who gathered evidence of Petitioner's mental health issues.[8]

13       Petitioner also argues that the court's factual findings were unreasonable with

14   respect to the various categories of mitigating evidence proffered by PCR counsel

15   because the court "ignored compelling evidence that went to the heart of [the] claim."

16   (*See, e.g.*, Doc. 273 at 68, 69.)

17       The court found that Petitioner's hyperthyroidism, mental illness, and borderline

18   IQ did not contribute to the crime and were inconsistent with the rational and calculating

19   way the conspiracy and murder were carried out. With respect to hyperthyroidism, the

20   court found:

21           Assuming McVay could have established that White suffered
22           from hyperthyroidism when he murdered Johnson and that

---

[8]    It is not clear that the appointment of a neuropsychologist would have led to significant new mitigating information about Petitioner's condition at the time of the crimes. In 2009, during these habeas proceedings, Petitioner was evaluated by a neuropsychologist, Dr. Kenneth Benedict. Dr. Benedict opined that it was "highly likely" Petitioner "manifested the symptoms of a primary attention disorder as a young child." (Doc. 277-2, Ex. 3 at 1.) With respect to Petitioner's schizophrenia, Dr. Benedict, while noting that "determining the onset of psychosis is speculative at best in Mr. White's case," opined that Petitioner "was quite likely showing at least intermittent and prodromal signs of psychosis prior to the crime." (*Id.* at 3.) Finally, Dr. Benedict found evidence of brain dysfunction and neuropsychological deficits which led him to diagnose Petitioner with Cognitive Disorder, Not Otherwise Specified. (*Id.*, Ex. 4 at 8.) Dr. Benedict further noted a "remote history of head trauma, although the relevance of this history is not clear." (*Id.*)

1
2
3
4

> such condition produced symptoms of anxiety, delusions, or paranoia, this Court would have concluded that such symptoms did not contribute to his conduct. This Court would have considered hyperthyroidism in mitigation but would have afforded it little weight and still would have imposed the death penalty.

5

(SER 259.)

6

    The court reached similar conclusions with respect to evidence of Petitioner's

7

mental illness. The court found the following facts:

8
9

> White corresponded with McVay discussing torture at the hands of DOC personnel, the use of "biotelemetry implants," and other unusual matters.

10

> . . . .

11
12

> McVay questioned whether White truly believed the accusations he made in correspondence.

13
14

> White behaved normally and rationally during face-to-face meetings with McVay . . . and did not mention the topics about which he wrote and did not show any outward symptoms of mental illness.

15

16

(SER 259–60.) Based on these facts the court made the following conclusions of law:

17
18

> McVay was not required under *Strickland* to request White's mental health records absent some suggestion that they might contain information with mitigating value.

19
20

> McVay acted reasonably in deciding to concentrate on other areas of mitigation.

21
22
23
24

> White has failed to show prejudice under *Strickland* because had McVay presented evidence of mental illness, this Court would have considered the same; however, such mental illness would have been afforded little weight by this Court— White's conduct was rational and calculating and he was clearly aware of his conduct and the wrongfulness thereof. White's mental illness, if any, would not have been sufficiently substantial to call for leniency.

25

26

(SER 260–61.)

27

    Petitioner asserts that the court's findings were unreasonable because the court

28

overlooked or discounted evidence that psychological manifestations of his mental and

physical conditions—including insomnia, disorganized thinking, paranoia, erratic behavior, mood swings, anxiety, grandiose illusions, delusional thoughts, and irrational judgment—likely affected his behavior during the crime. (*See* Doc. 273 at 68–69.)

The argument that the court ignored this evidence is unpersuasive. Judge Hancock specifically stated that even if the effects of the conditions had been proved, he would not have attached significant mitigating weight to them because the facts of the crime demonstrated that Petitioner behaved in a rational and calculated manner in carrying out the conspiracy to murder Johnson.

The court likewise considered Petitioner's arguments concerning McVay's failure to present evidence of Petitioner's alleged intellectual impairment, drug use, family violence, poverty, ADHD, and head injuries/seizures. (SER 261–63, 264–70.) The court also addressed the allegation that McVay performed ineffectively by failing to argue that Susan Johnson had the greater relative culpability in the crimes and that Petitioner was a model inmate. (SER 263–64, 270.) With respect to each of these mitigating circumstances, the court found that Petitioner could show neither deficient performance nor prejudice.

Petitioner has not established that the PCR court unreasonably determined the facts under § 2254(d)(2). The court's findings were not objectively unreasonable and the fact-finding process was not objectively inadequate.

## ii.    Application of *Strickland*

Petitioner alleges that the PCR court unreasonably applied *Strickland* in determining that McVay's performance was not deficient. He argues that the court unreasonably held that McVay's failure to gather records or interview witnesses was "reasonable" or "sound trial strategy" and that McVay did not have a duty to investigate potential evidence absent a suggestion that such evidence would be mitigating. (Doc. 273 at 51–54.) Petitioner asserts that McVay's duty to conduct a reasonable investigation required him to interview relevant witnesses and collect Petitioner's mental health records, school records, and medical records from jail and prison. (*Id.* at 53–54.) He also

1  argues that McVay's failure to investigate and present evidence of mental illness as a
2  mitigating factor was particularly unreasonable because he was on notice of Petitioner's
3  mental health issues. (*Id.* at 54–55.)

4       The PCR court found that "McVay acted reasonably in his belief that the opinions
5  of the prosecutors that White should not have received the death penalty was [sic] the
6  most compelling mitigation available." (SER 258.) The court further found that "McVay
7  was not required under *Strickland* to request White's mental health records absent some
8  suggestion that they might contain information with mitigating value." (SER 260.)

9       The PCR court concluded that McVay acted within prevailing professional
10 standards by retaining an investigator to gather mitigating evidence and by focusing his
11 argument on the prosecutors' view that this should not have been a death penalty case.
12 This Court, applying the doubly deferential standard required by *Strickland* and the
13 AEDPA, finds that the PCR court's decision was not an unreasonable application of
14 clearly established federal law under § 2254(d)(1).

15      Petitioner asserts that the PCR court's application of *Strickland* was unreasonable
16 because "[a]ny decision McVay made not to conduct a mitigation investigation was per
17 se unreasonable." (Doc. 273 at 51–52.) As Respondents note, this argument misconstrues
18 *Strickland*. In *Strickland* the Court explained:

> strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable
> professional judgments support the limitations on
> investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary.

23 466 U.S. at 690–91. The Court did not prescribe a set of rules applicable to every capital
24 sentencing.[9]

25      Under *Strickland*, a court deciding an ineffectiveness claim "must judge the

26 ─────────
[9]     In *Strickland*, defense counsel did not conduct an investigation, speak to character
27 witnesses, seek a psychiatric evaluation of his client, or present any mitigating evidence
   at sentencing. 466 U.S. at 672–73. Counsel instead focused on the defendant's emotional
28 distress at the time of the crime and his acceptance of responsibility. *Id.* at 699. The
   Supreme Court concluded that this was "a strategy choice . . . well within the range of
   professionally reasonable judgment." *Id.*

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Here, McVay represented Petitioner at resentencing before the same judge who had presided over Petitioner's trial and initial sentencing, and who had denied Petitioner's request for a Rule 11 competency examination. The judge had already considered, and found insufficiently mitigating, evidence of Petitioner's social history, including his difficult family background, past substance abuse, and inability to form relationships. The Arizona Supreme Court had independently reviewed these circumstances and reached the same conclusion. *White I*, 168 Ariz. at 512, 815 P.2d at 881.

There is a "reasonable argument" that McVay "satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. A fairminded jurist could agree with the PCR court that McVay performed competently under prevailing professional norms and under the circumstances of the case.

Even if this Court were to find that the PCR court unreasonably applied *Strickland* in its analysis of the deficiency prong, Petitioner would not be entitled to relief because the PCR court's prejudice analysis was not objectively unreasonable. A fairminded jurist could agree with Judge Hancock that there was not a reasonable probability of a different sentence if McVay had presented the omitted mitigating evidence.

Petitioner contends that the court's prejudice analysis was unreasonable because it did not cumulatively weigh the mitigating circumstances and because it applied the wrong standard under *Strickland*. (Doc. 273 at 55–57.) These arguments are unpersuasive.

In his order denying the PCR petition, Judge Hancock considered and rejected each of Petitioner's allegations that McVay performed ineffectively at resentencing. Having found neither deficient performance nor prejudice with respect to any of the omitted mitigating evidence, the PCR court did not unreasonably apply clearly established federal law by failing to undertake a separate cumulative prejudice analysis. *Compare Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004) (finding no cumulative

error where petitioner had "not demonstrated prejudice as to the individual claims" of ineffective assistance of counsel) *with Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (finding cumulative prejudice based on 11 instances of deficient performance).

Petitioner argues that the PCR court applied the wrong standard for assessing prejudice. Petitioner cites the court's statements that Petitioner "failed to establish prejudice under *Strickland* by showing a reasonable probability that this Court would have imposed a life sentence" if McVay had presented the omitted mitigating evidence. Petitioner contends that this standard is improperly "outcome determinative." (Doc. 273 at 56–57.)

The PCR court applied the proper standard. In *Strickland* the Court rejected the "outcome-determinative standard," which would require a showing that "counsel's deficient conduct more likely than not altered the outcome in the case." 466 U.S. at 693. The Court instead defined prejudice as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. That is the standard the PCR court used when it found there was not a "reasonable probability" that it would have imposed a life sentence if McVay had presented the mitigating evidence.

Judge Hancock considered all of the evidence presented by Petitioner during the PCR proceedings. This included the information gathered by Rohman documenting Petitioner's Graves' disease and schizophrenia, as well as the other categories of mitigating evidence omitted during resentencing. While Rohman was not qualified to opine whether Petitioner suffered from the symptoms of mental illness at the time of the crimes, Judge Hancock ruled that even if the circumstances had been proved he would not have found them sufficiently substantial to call for leniency.

Petitioner's new mitigating evidence isn't "reasonably likely" to have made an impact at sentencing, nor does its omission undermine confidence in the outcome of the sentencing. *Strickland*, 466 U.S. at 694. Judge Hancock, who sentenced and resentenced Petitioner, reviewed the additional mitigating evidence, including the information about

Petitioner's mental illness and Grave's disease, and "found it insufficient to change the sentence from death." *Schurz*, 730 F.3d at 816; *see Smith*, 140 F.3d at 1271; *Gerlaugh*, 129 F.3d at 1036. Under these circumstances, to find that Petitioner was prejudiced by resentencing counsel's performance, this Court would simply be substituting its judgment for that of the sentencer.

### 3.    Conclusion

Applying the doubly deferential standard of *Strickland* and the AEDPA, the Court finds there is a reasonable argument that McVay's performance satisfied *Strickland*'s deferential standard. Petitioner has not shown the PCR court's ruling was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

### 4.    Evidentiary Development

Petitioner seeks evidentiary development of Claim 1, including expansion of the record and an evidentiary hearing. (Doc. 273.) However, because the state court ruled on the merits of this claim, and because § 2254(d) precludes relief, Petitioner is not entitled to evidentiary development. *Pinholster*, 131 S. Ct. at 1411.

### B.    Claim 4

Petitioner alleges that the trial court denied his constitutional rights by improperly admitting prejudicial hearsay statements. (Doc. 273 at 82.) Citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973), Petitioner alleges that the state court's evidentiary rulings rendered his "trial fundamentally unfair and deprived him of due process of law." (*Id.* at 82.) He asserts that the Arizona Supreme Court's "adjudication of these claims was unreasonable in light of Supreme Court precedent." (*Id.*)

Claim 4 consist of several subclaims. Petitioner alleges that the court violated his due process and confrontation rights by admitting co-conspirator statements without providing Petitioner's proposed instruction on the jury's role in determining the admissibility of the statements. (*Id.* at 83–87.) He also alleges that his due process rights were violated when the court allowed testimony that Petitioner was a bigamist. (*Id.* at

88.) Finally, he alleges that the cumulative effect of the evidentiary errors violated his Fifth and Fourteenth amendment rights to a fair trial. (*Id.* at 89–90.)

Respondents contend that the claims were not properly exhausted on direct appeal because Petitioner did not allege violations of federal constitutional law. (Doc. 275 at 38–45.) The Court agrees.

To exhaust state remedies, a petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). A claim is "fairly presented" if the petitioner describes the operative facts and the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 63 (1982). A state prisoner does not fairly present a federal claim in state court unless he specifically indicates that the claim was based on federal law. *See, e.g., Lyons v. Crawford*, 232 F.3d 666, 669–70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (explaining that a general reference to insufficiency of evidence, right to be tried by impartial jury and ineffective assistance of counsel lacked the specificity and explicitness required to present federal claim); *Shumway v. Payne*, 223 F.3d 982, 987–88 (9th Cir. 2000) (finding "naked reference" to due process insufficient to present federal claim). A petitioner must make the federal basis of a claim explicit by citing specific provisions of federal statutory or case law, *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc). As the Supreme Court stated in *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam), "If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."

On direct appeal, Petitioner alleged only that the trial court erred in admitting the statements and testimony under Arizona Rules of Evidence 801(d)(2)(E) and 404(b). (SER 64–70.) He did not allege violations of federal law. (*Id.*) He did not cite federal statutory or case law, or make even a "naked reference" to a violation of his federal

1   constitutional rights. (*Id.*) Therefore, the claims are procedurally defaulted. *Coleman v.*

2   *Thompson*, 501 U.S. 722, 732 (1991).

3       Petitioner does not attempt to show cause and prejudice for the default, or a

4   fundamental miscarriage of justice. (*See* Doc 276 at 29.) Therefore, Claim 4 is barred

5   from federal review. *See Coleman*, 501 U.S. at 750 ("[F]ederal habeas review of the

6   claims is barred unless the prisoner can demonstrate cause for the default and actual

7   prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

8   consider the claims will result in a fundamental miscarriage of justice.").

9       **C.    Claim 5**

10      Petitioner alleges that his sentences violated the Double Jeopardy Clause. (Doc.

11  273 at 90.) The trial court sentenced Petitioner to life without possibility of parole for 25

12  years on the conspiracy conviction and imposed the death sentence for the first-degree

13  murder conviction. The court ordered that if Petitioner's death sentence were reduced to

14  life imprisonment, the sentences would be served consecutively. (SER 26.)

15      Petitioner argues that because the trial court instructed the jury on aiding and

16  abetting, the definition of which "overlaps" with that of conspiracy, he was "subjected to

17  multiple punishments (life and death) for the same offense—conspiracy to commit first-

18  degree murder and first-degree murder under accomplice-liability theory." (Doc. 276 at

19  30.)

20      Petitioner raised this claim on direct appeal. (SER 70–71.) The Arizona Supreme

21  Court rejected it, explaining:

22          There is only a problem if the defendant is punished twice for
            the same offense. Because we have upheld the death penalty
23          in this case, that is defendant's sole punishment. If we had
            reduced the punishment from death to life, we might have had
24          a problem of two statutes, conspiracy and aiding and abetting,
            being used to punish one crime twice. That is not the case
25          here and we need not answer the question.

26

27  *White I*, 168 Ariz. at 509, 815 P.2d at 878.

28      Petitioner contends that this decision was contrary to or an unreasonable

28

1  application of clearly established federal law and based on an unreasonable determination

2  of the facts. (Doc. 273 at 90.)

3       Respondents, citing *Blockburger v. United States*, 284 U.S. 299 (1932), argue that

4  the convictions and sentences do not violate double jeopardy because conspiracy to

5  commit murder and first-degree murder each require proof of an additional fact that the

6  other does not. (Doc. 275 at 46.) In *Blockburger* the Court held that "[t]he applicable rule

7  is that, where the same act or transaction constitutes a violation of two distinct statutory

8  provisions, the test to be applied to determine whether there are two offenses or only one,

9  is whether each provision requires proof of a fact which the other does not." 284 U.S. at

10 304; *see United States v. Arlt*, 252 F.3d 1032, 1039 (9th Cir. 2001) ("What is

11 determinative under the Court's double jeopardy doctrine is simply whether the statutes

12 involved require satisfaction of the same statutory elements, or whether each statute

13 requires proof of an element that the other does not.").

14      The elements of first-degree murder and conspiracy to commit first-degree murder

15 do not overlap. First-degree murder requires a killing; conspiracy does not. Conspiracy

16 requires an agreement; first-degree murder does not. Moreover, contrary to Petitioner's

17 argument, conspiracy and aiding and abetting are not identical offenses. Again,

18 conspiracy requires proof of an agreement. Aiding and abetting does not require an

19 agreement. *See Evanchyk v. Stewart*, 202 Ariz. 476, 480, 47 P.3d 1114, 1118 (2002)

20 ("We have held that responsibility as a conspirator is different from accomplice

21 liability.") (citing *State ex rel. Woods v. Cohen*, 173 Ariz. 497, 500, 844 P.2d 1147, 1150

22 (1992).

23      There was no double jeopardy violation, and the Arizona Supreme Court's denial

24 of the claim was neither contrary to nor an unreasonable application of clearly established

25 federal law.

26      Petitioner also contends that the Arizona Supreme Court's decision was based on

27 an unreasonable determination of the facts because the court erroneously stated that the

28 death sentence was Petitioner's "sole punishment." (Doc. 273 at 19; Doc. 276 at 31.) The

29

court's statement was not an error entitling Petitioner to relief. Because the death sentence was upheld, the two sentences were not to be served consecutively, and Petitioner was not punished twice for the same offense.

Claim 5 is denied.

## D.    Claim 6

Petitioner alleges that his due process rights were violated when the Arizona Supreme Court refused to provide funding for a mental health evaluation. (Doc. 273 at 93.) Petitioner raised this claim on direct appeal and the Arizona Supreme Court rejected it.

Prior to filing his opening brief, Petitioner moved the Arizona Supreme Court to remand the case to the trial court for a determination of whether Petitioner was competent to assist counsel in preparing the direct appeal. The court denied the motion.

Appellate counsel addressed this issue again in his opening brief. (SER 72–73.) He asserted that Petitioner "was denied due process of law" when the court denied his motion for a competency evaluation. (*Id.* at 72.) The Arizona Supreme Court rejected the claim. *White I*, 168 Ariz. at 509, 815 P.2d at 878. The court first noted that Petitioner conceded that his appeal should proceed even if he were found incompetent and that Petitioner "appears to raise the issue only to establish the groundwork for possible post-conviction relief." *Id.*

Next, the court reasoned that "[s]uspending the appeal would preclude this court from considering even the most clearly reversible or prejudicial error until the defendant regained competency." *Id.* The court quoted the *ABA Criminal Justice Mental Health Standards* (1989), *Standard* 7–5.4(c), which provides that: "Mental incompetence of the defendant *during the time of appeal* shall be considered adequate cause, upon a showing of prejudice, to permit the defendant to voice, *in a later appeal or action for postconviction relief,* any matter not raised on the initial appeal because of the defendant's incompetence." *Id.* (emphasis added in opinion). The court also noted that convicted defendants typically do not participate in appellate proceedings so their

1    competence does not affect the fairness of the decision. *Id.*

2         Petitioner alleges that the Arizona Supreme Court's ruling was contrary to and an

3    unreasonable application of clearly established federal law and based on an unreasonable

4    determination of the facts. (Doc. 273 at 93.) Respondents counter that the claim is

5    procedurally defaulted and barred because Petitioner failed to cite a federal basis for the

6    claim in state court. (Doc. 275 at 47.) Respondents also argue that the claims fails on the

7    merits because there is no clearly established federal law holding that there is a

8    constitutional right to competence during direct appeal. (*Id.* at 47–48.) Both arguments

9    are well taken.

10        First, Petitioner's appellate brief contained only a "naked reference" to a denial of

11   due process of law. *Shumway*, 223 F.3d at 987. This was insufficient to present a federal

12   claim to the Arizona Supreme Court. *Id.* Therefore the claim is procedurally defaulted

13   and barred from federal review. The claim is also meritless, because there is no United

14   States Supreme Court law holding that a defendant's due process rights are violated if his

15   direct appeal proceeds while he is incompetent.

16        Citing *Procunier v. Martinez*, 416 U.S. 396 (1974), Petitioner asserts that his

17   inability to communicate rationally with appellate counsel constituted a denial of access

18   to the courts. (Doc. 273 at 95–96.) *Martinez* held that under the Due Process Clause,

19   "[r]egulations and practices that unjustifiably obstruct the availability of professional

20   representation or other aspects of the right of access to the courts are invalid." 416 U.S. at

21   419 (holding that prison may not bar law students and paralegals employed by lawyers

22   from visiting prisoner clients); *see Bounds v. Smith*, 430 U.S. 817, 828 (1977) (holding

23   that "the fundamental constitutional right of access to the courts requires prison

24   authorities to assist inmates in the preparation and filing of meaningful legal papers by

25   providing prisoners with adequate law libraries or adequate assistance from persons

26   trained in the law"). Petitioner cites no support for the proposition that these right-of-

27   access cases extend to a right to competence on appeal.

28        In *Rohan*, 334 F.3d at 809, abrogated by *Gonzales*, 133 S. Ct. 696, the Ninth

31

Circuit observed that while the "capacity to communicate remains a cornerstone of due process at trial," the "constitutional scope" of the "right to competence *after* trial . . . remains unsettled." *Rohan* held that death row prisoners pursuing habeas relief had a *statutory* right to competence, arising from their statutory right to federally-funded counsel. *Id.* at 813. In *Nash v. Ryan*, 581 F.3d 1048 (9th Cir. 2009), the court extended that right to habeas appeals. The Supreme Court, however, held that there was no such statutory right. *Gonzales*, 133 S. Ct. 696. The Court found no support for a right to competence in the text of the statute or in the Court's constitutional precedents interpreting the Sixth Amendment. *Id.* at 702–03. The Court also noted that "[g]iven the backward-looking, record-based nature of most federal habeas proceedings, counsel can generally provide effective representation to a habeas petitioner regardless of the petitioner's competence." *Id.* at 704.

In *Hill v. Mitchell*, No. 1:98-cv-452, 2013 WL 1345831, at *74 (S.D. Ohio March 29, 2013), the district court discussed *Rohan* and *Nash* (prior to their abrogation in *Gonzales*) when considering a habeas petitioner's claim that he was incompetent during his direct appeals. After noting that a criminal defendant has a due process right to be competent for his trial under *Pate v. Robinson*, 383 U.S. 375, 378 (1966), and *Dusky v. United States*, 362 U.S. 402 (1960), the court addressed "the issue of whether a criminal defendant enjoys a constitutional right to be competent during direct appeal." *Id.* at *75. The court concluded that the case law "militates against a finding that criminal defendants enjoy a right to competency during direct appeal." *Id.* at *76. The court explained:

> The same reasoning that implies a right to competence from a right to counsel during trial and even on collateral attack does not support a right to competence during direct appeal. What distinguishes a trial and collateral attack from a direct appeal, with respect to a need for the accused to be competent, is the nature and extent of participation by the accused that is required. To be clear, at the heart of the right to competency is the need for an accused to be able to communicate with his or her counsel and assist with his or her defense. Because information vital to an accused's defense often resides exclusively in his or her mind, it is essential to his fundamental right to a fair trial that he or she be able to

communicate and interact with his or her counsel. A direct appeal, by contrast, is confined to the record and as such, would logically not require any information unknown to anyone but the defendant.

*Id.*[10]

State courts have reached the same conclusion. In *People v. Kelly*, 1 Cal.4th 495, 545, 822 P.2d 385, 413, 3 Cal.Rptr.2d 677, 705 (1992), the California Supreme Court, citing *White I*, rejected the defendant's argument that "his right to 'meaningful appellate review' and right to the effective assistance of counsel under the state and federal Constitutions preclude proceeding with the appeal if he is incompetent." The court explained: "The issues on appeal are limited to the appellate record. An appeal involves only legal issues based on that record. Attorneys do not need to rely on the defendant himself to decide what issues are worthy of pursuit." *Id.* (citations omitted).

The decision of the Arizona Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law because there is no Supreme Court precedent setting forth a right to competence during a criminal defendant's direct appeal. Claim 6 is denied as procedurally barred and meritless.

### E.    Claim 7

Petitioner alleges that he was denied his right to an impartial jury by the improper death-qualification of the jurors during *voir dire*. (Doc. 273 at 97.) Petitioner raised this claim on direct appeal, arguing "that the practice is illegal and unnecessary because the court decides punishment in Arizona." *White I*, 168 Ariz. at 509, 815 P.2d at 878. The Arizona Supreme Court denied the claim:

We have held that "jury questioning regarding capital punishment is permissible where the questioning determines bias of a nature which would prevent a juror from performing his duty." In Arizona death penalty cases, the jury determines guilt or innocence, while the death sentence is solely the trial judge's responsibility. The focus of the capital punishment *voir dire* is on the juror's ability to impartially determine guilt

---

[10]    The court also cited *Holmes v. Buss*, 506 F.3d 576, 579 (7th Cir. 2007). There, the Seventh Circuit assumed without deciding the existence of a right to competency during direct appeal while also noting that "[n]o cases address the issue" of what standard of competence is required on appeal.

1
2
3

or innocence "in accordance with the court's instructions and the juror's oath." Only when the juror's views about capital punishment "would prevent or substantially impair performance of the juror's duties" will there be error. Because no juror was so disqualified, we find no error.

4

*White I*, 168 Ariz. at 509–10, 815 P.2d at 878–79 (citations omitted).

5
6
7

Petitioner alleges that this ruling was contrary to or an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts. (Doc. 273 at 97–98.) The Court disagrees.

8
9
10
11
12
13

First, clearly established federal law holds that the death-qualification process in a capital case does not violate a defendant's right to a fair and impartial jury. *See Lockhart v. McCree*, 476 U.S. 162, 178 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (upholding that death qualification of Arizona jurors not inappropriate); *Bible v. Schriro*, 497 F.Supp.2d 991, 1046 (D. Ariz. 2007).

14
15
16
17
18
19

Petitioner contends that the Arizona Supreme Court's decision was an unreasonable determination of the facts because it found that no juror was improperly disqualified. *White I*, 815 P.2d at 878. Petitioner notes that juror Huffman, who stated that she opposed the death penalty but believed she could be impartial (RT 6/29/88 at 125–26), was struck by the State, and asserts that her removal violated *Witherspoon v. Illinois*, 391 U.S. 510, 521–22 (1968).

20
21
22
23
24
25

The Arizona Supreme Court did not err in stating that *Witherspoon* prohibits only the "for cause" exclusion of jurors who express scruples against the death penalty. *Witherspoon*, 391 U.S. at 522; *see e.g.*, *Bowles v. Secretary for Dept. of Corrections*, 608 F.3d 1313, 1316 (11th Cir. 2010); *Dennis v. Mitchell*, 354 F.3d 511, 525–26 (6th Cir. 2003). The State used a peremptory strike to remove Huffman. (*See* RT 12/15/95 at 17.) Because she was not removed for cause, there was no *Witherspoon* violation.

26

Claim 7 is denied.

27

**F.    Claims 8–10**

28

Petitioner alleges that the failure of counsel and the trial court to ensure that all

bench conferences were recorded violated his right to a public trial, Claim 8, and hindered his right to appeal, Claim 10. (Doc. 273 at 99, 103.) In Claim 9, Petitioner alleges that his right to be present during his trial was violated by the court's failure to ensure his presence at bench conferences and *in camera* proceedings. (*Id.* at 101.)

Petitioner raised these claims in his first PCR proceeding. (SER 92–96.) The court denied them without explanation. (SER 121.) Although they were denied summarily, it is presumed that the state court denied the claims on the merits. *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). When a state court denies a claim without explanation, a federal court applying § 2254 "must determine what arguments or theories supported or, as here, could have supported" it, and then "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 102.

For the reasons set forth below, the Court will deny these claims.

### 1.    Claims 8 and 10

In Claim 8, Petitioner states that during his trial more than 25 bench conferences were unrecorded. (Doc. 273 at 100.) He alleges that these omissions from the record violated his Sixth Amendment right to a public trial. (*Id.*) In Claim 10, he alleges that the failure to record the conferences deprived him of "a meaningful appeal because it was impossible for the Arizona Supreme Court to conduct its independent review" and that "the review of his death sentence and now his habeas petition is incomplete." (Doc. 273 at 104.)

Petitioner cites *Waller v. Georgia*, 467 U.S. 39 (1984), in support of his claim that he was deprived of a public trial. *Waller* does not suggest that Petitioner's right to an open trial was violated by the court's failure to record the bench conferences.

In *Waller* the Supreme Court held that the Sixth Amendment right to a public trial

extended to a suppression hearing. The Court explained that "the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public. The central aim of a criminal proceeding must be to try the accused fairly." *Id.* at 46. A public trial facilitates fairness for a defendant by "ensuring that judge and prosecutor carry out their duties responsibly." *Id.*; *see Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979) (explaining that a public trial benefits the accused because "the public may see he is fairly dealt with and not unjustly condemned, and . . . the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions") (quotations omitted). A public trial also "encourages witnesses to come forward and discourages perjury." *Waller*, 467 U.S. at 46.

*Waller* held that these objectives are frustrated if a suppression hearing is closed to the public. *Id.* at 47. The Court explained that the outcome of the suppression hearing may determine the outcome of the trial and noted that "a suppression hearing often resembles a bench trial: witnesses are sworn and testify, and of course counsel argue their positions. The outcome frequently depends on a resolution of factual matters." *Id.* Moreover, "[t]he accused in a suppression hearing also routinely attacks the conduct of the police and the prosecutor, which should be subject to public scrutiny." *United States v. Norris*, 780 F.2d 1207, 1210 (5th Cir. 1986).

The concerns addressed in *Waller* are not implicated by the failure to record the bench conferences in Petitioner's trial. Non-public exchanges between the court and counsel on legal or administrative matters "do not hinder the objectives which the Court in *Waller* observed were fostered by public trials." *Id.*; *see Rovinsky v. McKaskle*, 722 F.2d 197, 201 (5th Cir. 1984) ("Sidebar conferences in which the defendant's counsel participates without objection do not violate the right to a public trial."). In contrast to a hearing on a suppression motion, a bench conference serves no fact-finding purpose. *Id.* "A routine evidentiary ruling is rarely determinative of the accused's guilt or innocence. Also, such evidentiary rulings ordinarily pose no threat of judicial, prosecutorial or public

36

abuse that a public trial is designed to protect against." *Id.* at 1210–11.

There was no violation of Petitioner's right to a public trial. The PCR court's denial of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Claim 8 is denied.

In Claim 10, Petitioner contends that his right to appeal was hindered by the trial court's failure to record bench conferences. When a state chooses to provide for appellate review, the state must provide a defendant with "a record of sufficient completeness to permit proper consideration of [his] claims" in order to satisfy the constitutional guarantees of due process and equal protection. *Mayer v. City of Chicago*, 404 U.S. 189, 193–94 (1971) (citation and internal quotations omitted); *see Britt v. North Carolina*, 404 U.S. 226, 227 (1971) ("there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal") (citations omitted). A record of sufficient completeness "does not translate automatically into a complete verbatim transcript." *Mayer*, 404 U.S. at 194. Whether a transcript is needed for an effective defense or appeal depends on: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Britt*, 404 U.S. at 433–34.

The Ninth Circuit, while noting that "[t]here is no Supreme Court or Ninth Circuit authority on the due process implications of a state court's failure to record portions of a criminal trial," has held that the *Britt* criteria apply in evaluating a habeas petitioner's claim that the reconstruction of unrecorded portions of state trial court proceedings was inadequate for him to make an effective appeal. *Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989).

"Petitioner has the burden of establishing prejudice from the lack of a complete transcript in light of the alleged value of the transcript and the availability of alternatives that would fulfill the same functions." *Id.* at 648–49; *see Scott v. Elo*, 302 F.3d 598, 604

(6th Cir. 2002) (explaining that "federal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice"); *White v. State of Florida, Department of Corrections*, 939 F.2d 912, 914 (11th Cir. 1991) ("[I]n a federal habeas corpus case brought by a state prisoner, the absence of a perfect transcript does not violate due process absent a showing of specific prejudice").

Beyond the conclusory statement that he was deprived of a meaningful appeal, Petitioner does allege that he was prejudiced by the absence of a transcript of the bench conferences. He highlights the "omission from the record of any transcript involving the exercise of all twenty peremptory challenges" (Doc. 273 at 104), but offers no suggestion as to why the omitted transcript is prejudicial. He has not met his burden of showing prejudice from the incomplete trial transcript. *See Madera*, 885 F.2d at 648 (indicating a petitioner must identify a "tenable theory" as to the appealable error that would be found in the missing transcript); *Scott*, 302 F.3d at 605 (finding no prejudice where petitioner offered only "gross speculation of error in the missing portion of the transcript")."

The PCR court's denial of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Claim 10 is denied.

## 2.     Claim 9

Petitioner states that he was excluded from more than 40 conferences at the bench and in chambers, and at only one of these conferences is there a record of counsel waiving Petitioner's presence. (Doc. 273 at 101.) He alleges that his absence from these conferences violated his Confrontation Clause and due process rights. (*Id.*)

A criminal defendant's constitutional right to be present at all stages of his trial derives from the Confrontation Clause of the Sixth Amendment and is protected by the Due Process Clause where the defendant does not actually confront the witness against him. *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (citing *Illinois v. Allen*, 397 U.S. 337 (1970)). A defendant has a due process right to be present at a proceeding when his presence has a reasonably substantial relation to his opportunity to present a defense. *Id.*

38

(citing *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964)); *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The Court has emphasized that the "privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *Stincer*, 482 U.S. at 745 (quoting *Snyder*, 291 U.S. at 106–07). Rather, a defendant has the right to be present only "to the extent that a fair and just hearing would be thwarted by his absence." *Id.* Violations of the right to be present are subject to harmless error analysis. *Rushen v. Spain*, 464 U.S. 114, 119 n.2 (1983); *see Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc).

The majority of instances cited by Petitioner consist of bench conferences attended by his counsel to discuss evidentiary issues such as relevance and foundation. (*See* RT 7/1/88 at 542–43; RT 7/7/88 at 830.) Petitioner does not indicate how his presence at these conferences would have been beneficial or how his absence thwarted the fairness of his trial. *See Gagnon*, 470 U.S. at 527 (explaining respondents "could have done nothing had they been at the conference, nor would they have gained anything by attending"); *see also United States. v. Vasquez*, 732 F.2d 846, 848–49 (11th Cir. 1984) (finding that bench conference attended by defense counsel to discuss evidentiary matter was not critical stage of trial proceedings at which defendant had a right to be present).

The other incident Petitioner cites involved defense counsel's renewed request to excuse a juror. (*See* RT 7/11/88 at 1264–65.) On the second day of trial, the juror expressed concern that she might recognize Petitioner. In the presence of counsel the court discussed the matter with the juror. She stated she could not be sure she recognized Petitioner; she thought it was unlikely, but if she did recognize him it was not on a "personal basis." (RT 6/30/88 at 325.) She also stated that she believed she could be fair even if she had seen Petitioner before the trial. (*Id.* at 325–26.) The court denied counsel's motion to remove the juror. (*Id.* at 329.)

During an *in camera* meeting at the close of the State's case, defense counsel again requested that the juror be excused and the court again denied the motion. (RT

39

7/11/88 at 1264–65.) Petitioner asserts that his "presence would have been important to support the factual basis of the motion on how the juror knew [him]." (Doc. 273 at 102.) This argument fails because there is no indication that the juror actually knew Petitioner. Moreover, if the two were acquainted Petitioner could have informed counsel of that fact at any point during his trial. Petitioner's attendance at the *in camera* meeting was not required for counsel to support his renewed motion to excuse the juror. *See Stincer*, 482 U.S. at 747 (finding no due process violation when the trial court conducted *in camera* hearing, in the absence of the defendant but in the presence of his attorney, to determine whether the children he was accused of molesting were competent to testify at trial); *Gagnon*, 470 U.S. at 527 (finding no violation when the court held conference, unattended by the defendants and most of their attorneys, to question juror).

Because Petitioner's presence at any of the conferences identified in his petition would not have been useful in ensuring a more reliable determination of any of the matters at issue in his trial, *Stincer*, 482 U.S. at 745, the PCR court's denial of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

## G.    Claims 13 and 14

In Claim 13, Petitioner alleges that the trial court violated his Eighth Amendment and due process rights by improperly considering victim impact statements. (Doc. 273 at 105.) In Claim 14, he alleges that his due process rights and right to a fair sentencing were violated when the presentence officer noted that the crime was committed in an especially heinous manner. (Doc. 273 at 107.) Petitioner raised the claims during his first PCR proceedings, and they were summarily denied. Petitioner is not entitled to relief.

### 1.    Claim 13

Petitioner alleges that his rights were violated because the trial court, both at the initial sentencing and at resentencing, received information indicating that the victim's

1    family and friends recommended Petitioner be sentenced to death.[11]

2        In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the

3    introduction of a victim impact statement to a capital sentencing jury violated the Eighth

4    Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court

5    revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not

6    erect a per se barrier to the admission of victim impact evidence but leaving intact

7    *Booth*'s prohibition on the admission of characterizations and opinions from the victim's

8    family about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2.

9    Under Arizona law at the time of Petitioner's trial, however, the trial judge, rather than a

10    jury, determined the penalty in a capital case. In *Gulbrandson v. Ryan*, 738 F.3d 976,

11    995–96 (9th Cir. 2013), the Ninth Circuit rejected the petitioner's *Booth* claim, finding

12    that there was no clearly established federal law directly addressing the question of

13    whether a judge, as opposed to jury, is prohibited from considering victim impact

14    evidence. The court explained:

15            We previously recognized this distinction in *Rhoades v.*
16        *Henry*, 638 F.3d 1027 (9th Cir. 2011), where we held that
        *Booth*'s concern that victim impact statements would
17        "inflame the jury" is "not the same when . . . a judge does the
        sentencing." *Id.* at 1055. As we have explained, courts "must
18        assume that the trial judge properly applied the law and
        considered only the evidence he knew to be admissible."
19        *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997);
        *Rhoades*, 638 F.3d at 1055.

20            Accordingly, because there is no Supreme Court case
21        "squarely address[ing] the issue" whether a judge is barred
        from consideration of such victim impact evidence, it cannot
22        be said that the Arizona Supreme Court unreasonably applied
        clearly established federal law when it denied Gulbrandson's
23        Eighth Amendment claim.

24    *Id.* at 966.

25        Moreover, there is no evidence that the trial court, at the initial sentencing or

26    resentencing, disobeyed or misapplied the law by improperly considering the opinions of

27    the victim's family when determining Petitioner's sentence. Nor is there evidence that the

28    ────────────────
        [11] The information was contained in the presentence report and in letters from the
    victim's family and friends. (SER 41, 136–37; RT 12/9/96 at 13–14.)

1   Arizona Supreme Court in its independent review of Petitioner's sentence improperly

2   considered the victim impact evidence.

3         The PCR court's denial of this claim was not "so lacking in justification that there

4   was an error well understood and comprehended in existing law beyond any possibility

5   for fairminded disagreement." *Richter*, 562 U.S. at 103. Claim 13 is denied.

6                  **2.**      **Claim 14**

7         Petitioner's 1988 presentence report listed as a sentencing factor the "[e]specially

8   heinous manner in which the offense was committed." (SER 45.) Petitioner contends that

9   this information was improper and the trial court's consideration of the evidence

10  "infected the sentencing proceeding with unfairness," denying Petitioner's right to due

11  process. (Doc. 273 at 107–08.)

12        This claim is denied for the reasons set forth above with respect to Claim 13.

13  There is no clearly established federal law governing the claim, judges are presumed to

14  know how to apply the law, and there is no evidence suggesting that the trial court and

15  the Arizona Supreme Court improperly considered the information in reaching their

16  sentencing decisions.

17        **H.**      **Claim 15**

18        Petitioner alleges that counsel Lockwood performed ineffectively at the guilt

19  phase of trial. (Doc. 273 at 108–24.) The claim consists of eight subclaims, four of which

20  (A, B, E, and F) were raised in state court during the first PCR proceedings.[12] With

21  respect to the remaining subclaims (G, H, J, and K), Petitioner contends that their default

22  in state court is excused by PCR counsel's ineffective performance. Petitioner seeks

23  discovery, expansion of the record, and an evidentiary hearing in support of the claim.

24  (Doc. 277.)

25                 **1.**      **Claims 15(A), (B), (E), and (F)**

26        For the reasons explained above, because subclaims A, B, E, and F were raised in

27  Petitioner's first PCR and denied on the merits, under *Pinholster* Petitioner is not entitled

28  ---
   [12]    In his amended petition, Petitioner withdrew Claims 15(C), (D), and (I). (Doc. 273 at 114, 118.)

to evidentiary development. Relief is precluded under § 2254(d) because the state court's denial of these claims was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner alleges that trial counsel performed ineffectively by failing to ensure Petitioner's presence at all stages of the proceedings and failing to obtain Petitioner's consent for the absences, Claim 15(A); failing to ensure that all necessary proceedings were recorded, Claim 15(B); failing to object to the presentence report on the grounds that it contained improper victim-impact evidence, Claim 15(E); and failing to object to the presentence report on the grounds that it contained improper information regarding the existence of an aggravating factor not presented by the State, Claim 15(F). (Doc. 273 at 108–15.)

Petitioner raised these claims during his first PCR proceeding, and the court denied them summarily. (SER 118, 121.) The denial was a ruling on the merits and is entitled to deference under § 2254(d). *Richter*, 562 U.S. at 99.

Fairminded jurists could disagree on the correctness of the state court's denial of these claims. *Id.* at 101. For the reasons discussed in the Court's analysis of Claims 8, 9, 10, 13, and 14, Petitioner was not prejudiced by counsel's allegedly deficient performance. There is no reasonable probability that the result of the trial or sentencing would have been different if counsel had ensured Petitioner's presence at all bench conferences and in camera proceedings, ensured that such conferences were recorded, and objected to the contents of the pre-sentence report.

### 2. Claims 15(G), (H), (J), and (K)

As described next, Petitioner is not entitled to evidentiary development on Claims 15(G), (H), (J), and (K). The claims are not "substantial" under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), so their default is not excused. They remain barred from federal review.

Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman*, 501 U.S. at 750 (1991). In such situations, federal habeas review is barred

43

unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Id. Coleman* further held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court announced a new, "narrow exception" to the rule set out in *Coleman*. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez*, 132 S. Ct. at 1320)).

Accordingly, under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance claim "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014); *Dickens v. Ryan*, 740 F.3d 1302, 1319–20 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).

In a series of cases, the Ninth Circuit has provided guidelines for applying *Martinez*. The most recent case, *Clabourne*, summarizes the court's *Martinez* analysis. To demonstrate cause and prejudice sufficient to excuse the procedural default, a

petitioner must make two showings. "First, to establish 'cause,' he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland*. *Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377 (citations omitted). Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* at 377–78. Second, "to establish 'prejudice,' the petitioner must establish that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

Under *Martinez*, a claim is substantial if it meets the standard for issuing a certificate of appealability. *Martinez*, 132 S. Ct. 1318–19 (citing *Miller-El*, 537 U.S. at 322). According to that standard, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich*, 740 F.3d at 1245 (quoting *Miller-El*, 537 U.S. at 336).

### (a)     Claim 15(G)

Petitioner alleges that Lockwood was ineffective for failing to object to the death qualification of the jury. This claim is clearly without merit. Counsel did not perform ineffectively because a challenge to death qualification of the jury would have been rejected.

On direct appeal Petitioner argued that "he was denied his right to an impartial jury because the jurors were 'death qualified' during *voir dire*" and that the practice of death qualification "is illegal and unnecessary because the court decides punishment in Arizona." *White I*, 168 Ariz. at 509, 815 P.2d at 878. As discussed above, the Arizona Supreme Court denied the claim.

Because there was no support for the proposition that death qualifying a jury for

45

the guilt phase of trial violated a defendant's rights, and because the Arizona Supreme Court rejected just such a claim, it would have been futile for trial counsel to have challenged the death qualification process. "[C]ounsel's failure to make a futile motion does not constitute ineffective assistance of counsel." *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *see Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (explaining that "the failure to take a futile action can never be deficient performance"); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

The claim is not substantial under *Martinez*. Therefore, Petitioner fails to meet the prejudice prong of the cause and prejudice analysis, *see Clabourne*, 745 F.3d at 377, and default of the claim is not excused. Because the claim is defaulted and procedurally barred, Petitioner is not entitled to evidentiary development.

### (b)     Claim 15(H)

Petitioner alleges that trial counsel was ineffective for failing to *voir dire* the jury panel. (Doc. 273 at 118.)

At the time of Petitioner's trial, Rule 18.5(d) of the Arizona Rules of Criminal Procedure provided: "The court shall conduct the *voir dire* examination, putting to the jurors all appropriate questions requested by counsel. The court may in its discretion examine one or more jurors apart from the other jurors. If good cause appears, the court may permit counsel to examine an individual juror."

Petitioner contends that there was "good cause" for Lockwood to question the jury because it was a capital case and "counsel could have argued that once the judge began asking death-related questions, he had shown good cause for being able to ask follow-up questions to uncover potential bias." (Doc. 273 at 118.) According to Petitioner, counsel's failure to ask questions "fell below the prevailing performance standards." (*Id.*)

Even assuming that counsel's failure to *voir dire* potential jurors constituted deficient performance under *Strickland*, Petitioner does not allege, let alone show, that he was prejudiced by this aspect of counsel's performance. Prejudice exists if counsel fails

46

to question a juror during *voir dire* or move to strike a juror and that juror is found to be biased, because this evinces "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Fields v. Brown*, 503 F.3d 755, 776 (9th Cir. 2007) (en banc) (quoting *Strickland*, 466 U.S. at 694); *see Ruderman v. Ryan*, 484 Fed.Appx. 144, 145 (9th Cir. 2012). Petitioner does not argue that any biased jurors were empaneled.

The claim is not substantial under *Martinez*. Therefore, Petitioner fails to meet the prejudice prong of the cause and prejudice analysis, *see Clabourne*, 745 F.3d at 377, and default of the claim is not excused. Because the claim is defaulted and procedurally barred, Petitioner is not entitled to evidentiary development.

### (c)   Claim 15(J)

Petitioner alleges that Lockwood performed ineffectively by failing to retain and present testimony from a crime-scene expert. (Doc. 273 at 119–23.)

The State's theory of the case was that Petitioner and Susan conspired to kill Susan's husband, and that Petitioner was the actual shooter. (*See* RT 7/13/88 at 1444–45, 1468.) The lead detective, Gordon Diffendaffer, testified that in his opinion the assailant first shot David from the driveway, closer to the street and away from the carport door. (RT 7/8/88 at 1066.) The State's theory of the shooter's position was based on the location of the potato pieces and the trajectory of the shots. (*See* RT 7/13/88 at 1467–69.)

The defense theory was that Petitioner was present at the scene but did not shoot David. (*See* RT 7/12/88 at 1274.) Petitioner, the only witness Lockwood presented, testified that he exited the back door of the house that led to the carport and saw Susan pointing a gun at David. (*Id.* at 1392–93.) Petitioner testified that he pushed Susan's arms down in an effort to prevent her from shooting David. (*Id.* at 1394–96.) The gun went off, striking David in the chin. (*Id.* at 1396.)

Petitioner alleges that Lockwood was ineffective for failing to call an expert at trial to rebut the opinions of the State's witnesses and support Petitioner's version of the shooting. (Doc. 273 at 122.) According to Petitioner, an expert could have explained the

shortcomings of the crime-scene investigation, including the fact that the scene was not properly secured, that the photographs taken were not consistent with standard practice, that the crime scene diagram was not drawn to scale, and that evidence was not gathered in accordance with standard practice. (*Id.*) The expert also could have testified that the ballistics, potato residue, and blood spatter evidence showed the shooter was not coming from the street but instead from the rear of the carport near the carport doorway. (*Id.*) According to Petitioner, this testimony would have supported his version of the crime and discredited the State's witnesses.[13]

Respondents counter that Petitioner was not prejudiced by counsel's performance, because "[e]ven if Lockwood had requested a crime scene expert and the trial court authorized it, there is no reasonable probability that an expert's opinion would overcome other evidence in the case." (Doc. 275 at 61–62.) The Court agrees.

The evidence at trial was consistent with Petitioner's role as the shooter. Petitioner bought the murder weapon a month before the killing and sold it two days after the murder. Following Petitioner's arrest, police searched his vehicle and found a box of .38 caliber bullets and a bag of potatoes.

Moreover, the victim himself described the shooter as a "man with a mask on" (RT 6/30/88 at 369), and three witnesses saw a male figure running away from the crime scene. (RT 6/29/88 at 179, 181, 193, 210; RT 6/30/88 at 256–57, 302, 398, 413, 486; RT 7/7/88 at 880–82, 909.) Based on this evidence, a defense theory identifying Susan as the shooter was not plausible, and Petitioner was not prejudiced by counsel's failure to advance such a theory through the use of a crime scene expert.

The claim is not substantial under *Martinez*. Therefore, Petitioner fails to meet the prejudice prong of the cause and prejudice analysis, *see Clabourne*, 745 F.3d at 377, and default of the claim is not excused. Because the claim is defaulted and procedurally barred, Petitioner is not entitled to evidentiary development.

[13] Petitioner seeks to expand the record with the declaration of crime-scene expert Lawrence Renner, whose opinion concerning the location of the shooter supports Petitioner's trial testimony. (Doc. 277-1, Ex. 9.)

48

1    **(d)    Claim 15(K)**

2         Petitioner alleges that the cumulative prejudicial impact of Lockwood's deficient

3    performance denied his rights under the Sixth and Fourteenth Amendments.

4         "When an attorney has made a series of errors that prevents the proper

5    presentation of a defense, it is appropriate to consider the cumulative impact of the errors

6    in assessing prejudice." *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998) (citing

7    *Harris v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir. 1995)); *see Davis*, 384 F.3d at 654 ("It

8    is true that, although individual errors may not rise to the level of a constitutional

9    violation, a collection of errors might violate a defendant's constitutional rights.").

10        Petitioner's claim of cumulative prejudice is not substantial, however, because, as

11   already discussed, he has not demonstrated prejudice with respect to any of counsel's

12   alleged deficiencies. *Davis*, 384 F.3d at 654. Counsel's performance at trial "did not

13   render [Petitioner's] trial fundamentally unfair." *Id.*; *see Woods v. Sinclair*, 764 F.3d

14   1109, 1139 (9th Cir. 2014). Given the overall strength of the State's case and the

15   overwhelming evidence of Petitioner's guilt, there was no prejudice from the cumulative

16   effect of Lockwood's alleged deficiencies. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th

17   Cir. 2007).

18        The claim is not substantial under *Martinez*. Therefore, Petitioner fails to meet the

19   prejudice prong of the cause and prejudice analysis, *see Clabourne*, 745 F.3d at 377, and

20   default of the claim is not excused. Because the claim is defaulted and procedurally

21   barred, Petitioner is not entitled to evidentiary development.

22   **I.    Claims 17- 22**

23        Petitioner alleges that the state courts violated his right to a fair sentencing and due

24   process by "failing to consider" several forms of mitigating evidence and by finding that

25   the mitigating circumstances were not sufficiently substantial to call for leniency. The

26   Arizona Supreme Court, on appeal from resentencing, rejected these claims. *White II*, 194

27   Ariz. at 351–53, 982 P.2d at 826–28.

28

1       **1.      Claim 17**

2           Petitioner alleges that the state courts "failed to consider mitigating evidence from

3   the prosecutor that the co-defendant was the mastermind and failed to give consideration

4   to the disparity between the two sentences." (Doc. 273 at 130.)

5           On appeal from Petitioner's first trial and sentencing, the Arizona Supreme Court

6   considered and rejected the disparate sentencing claim:

7                   [T]he record establishes a rational basis for the different
                    penalties in this case. The trial judge found that defendant
8                   committed the actual killing of David. He also found no
                    mitigating factors sufficient to warrant leniency for
9                   defendant. The court, however, did find mitigating factors
                    sufficient to warrant leniency for Susan (no prior criminal
10                  record, kind and caring mother, death sentence would be
                    devastating to her six-year-old daughter, potential for
11                  violence was minimal, difficult childhood, difficult marriage
                    to Clifford Minter followed by a difficult dissolution).
12                  Moreover, the jury foreman wrote to the trial judge following
                    the trial advising him that all twelve jurors recommended
13                  leniency for Susan.

14

15  *White I*, 168 Ariz. at 513–14, 815 P.2d at 882–83.

16          In resentencing Petitioner to death, Judge Hancock directly addressed the issue of

17  disparate sentences as follows: "Mr. White conveniently forgets that he was the

18  triggerman and that he planned, plotted, and executed this killing. . . . I have again

19  considered whether the sentence of your codefendant and your sentence was [sic]

20  fundamentally unfair, inappropriately disparate and a denial of equal protection." (SER

21  142, 143.)

22          Judge Hancock also stated that he "reviewed the mitigating circumstances in this

23  case" and "considered all relevant facts in determining whether any mitigating

24  circumstances are present which are sufficiently substantial to call for leniency." (SER

25  139–140.) He reiterated that he "reviewed all of the facts of this case to find mitigating

26  circumstances" and "considered each and every fact raised by [Petitioner]." (SER 143.)

27          On appeal from resentencing, the Arizona Supreme Court again rejected

28  Petitioner's disparate sentencing claim:

Unexplained disparity between the sentences of a defendant and codefendant may be a mitigating factor in a capital case. Where the defendant commits the killing, i.e., actually pulls the trigger, the disparity in sentences as between coconspirators is explained.

. . . .

White argues that several common factors militate against disparate sentencing: both he and Susan planned the killing; neither had a prior felony record; imposition of capital punishment would be devastating to children of both; neither has a record of violence; both had a difficult childhood; there is no difference as to culpability; the same aggravator (pecuniary gain) applies to both; and the mitigators are similar. Further, White asserts that the trial court failed to explain the disparity in sentences and took no account of the argument that Susan was the mastermind behind the killing.

Little has changed since our decision in *White I*. The nucleus of the new evidence is Hammond's testimony that Susan Johnson was the mastermind. While there are similarities in the evidence as between the defendant and Susan, we agree with Judge Hancock's consideration of the disparate sentence issue.

. . . .

Judge Hancock found defendant's disparate treatment argument insufficient as mitigation, as do we. In *State v. Jackson,* we held that if disparity in sentences is justified by relative culpability, it receives little, if any weight. 186 Ariz. 20, 32, 918 P.2d 1038, 1050 (1996). We find that to be true here as well.

Accordingly, we conclude that defendant has presented nothing new that would justify a different posture by the court on the matter of disparate sentencing. Indeed, nothing of substance has changed.

*White II*, 194 Ariz. at 352–53, 982 P.2d 827–28 (citations omitted). The court also gave "independent consideration to the mitigating factors," including Susan Johnson's disparate sentence. *Id.* at 354, 982 P.2d at 829.

Petitioner contends that Arizona Supreme Court's denial of this claim was based on both an unreasonable determination of the facts and an unreasonable application of clearly established federal law because the court failed to take into account the prosecutor's opinion that Susan Johnson was the instigator of the murder and the "brains

51

behind" the plot to kill her husband. (Doc. 273 at 130.) Petitioner asserts that the court failed to consider this evidence in violation of *Tennard v. Dretke*, 542 U.S. 274 (2004), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978). The Court disagrees.

Once a determination is made that a person is eligible for the death penalty, the sentencer must consider relevant mitigating evidence, allowing for "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). Therefore, the sentencer in a capital case is required to consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett*, 438 U.S. at 604 (holding that the right to individualized sentencing in capital cases was violated by an Ohio statute that permitted consideration of only three mitigating factors); *Eddings*, 455 U.S. at 113–15 (holding that *Lockett* was violated where state courts refused as a matter of law to consider mitigating evidence that did not excuse the crime). The sentencer must be allowed to consider, and may not refuse to consider, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

In *Tennard*, the Supreme Court reiterated that it is not enough simply to allow a defendant to present mitigating evidence; rather, the sentencer must be able to consider and give effect to that evidence. 542 U.S. at 285. Based on that principle, the Court invalidated a "screening test" applied by the Fifth Circuit that required the defendant to prove a "nexus" between mitigating evidence and the offense in order for the evidence to be considered by the sentencer. *Id.*

However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998). There is no set formula for weighing mitigating evidence, and the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a

member of the class made eligible for that penalty." *Zant v. Stephens*, 462 U.S. 862, 875 (1983); *see Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("[O]ur precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here."); *Harris v. Alabama*, 513 U.S. 504, 512 (1995) (explaining that the Constitution does not require a specific weight to be given to any particular mitigating factor).

Petitioner's sentencing did not violate these principles. Both the trial judge and the Arizona Supreme Court considered Petitioner's disparate sentencing argument, including his contention that Susan Johnson was the "mastermind" behind the crimes. Because the state courts considered all of the mitigating evidence, there was no constitutional violation.

First, Judge Hancock expressly stated that he had "considered" all of Petitioner's proffered mitigating factors, including Petitioner's disparate sentencing argument. (SER 139–40, 141–42.) This statement is dispositive of Petitioner's claim. *See Parker v. Dugger*, 498 U.S. 308, 314–15 (1991) ("We must assume that the trial court considered all [mitigating] evidence before passing sentence. For one thing, he said he did."); *(George) Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007) (explaining that "a court is usually deemed to have considered all mitigating evidence where the court so states"); *Moormann v. Schriro*, 426 F.3d 1044, 1055 (9th Cir. 2005) ("This court may not engage in speculation as to whether the trial court actually considered all the mitigating evidence; we must rely on its statement that it did so.").

Next, the Arizona Supreme Court in its independent review did not exclude Petitioner's mitigating evidence from consideration. Instead, the court explicitly gave "independent consideration to the mitigating factors," including Susan Johnson's disparate sentence. *White II*, 194 Ariz. at 354, 982 P.2d at 829. The fact that the courts found that the disparate sentences were warranted by Petitioner's role as the triggerman does not violate *Lockett*, *Eddings*, or *Tennard*. Again, there is no constitutional

53

1   requirement that the sentencer assign proffered mitigating evidence any particular weight.

2   *See Harris*, 513 U.S. at 512; *Marsh*, 548 U.S. at 175; *Williams v. Stewart*, 441 F.3d 1030,

3   1057 (9th Cir. 2006) ("We have recognized a distinction between a failure to consider

4   relevant evidence and a conclusion that such evidence was not mitigating.").

5          Moreover, contrary to Petitioner's argument, the decisions of the state courts were

6   not based on an unreasonable determination of the facts. There was sufficient evidence

7   for the courts to conclude it was Petitioner who shot and killed David Johnson.

8                        **2.      Claim 18**

9          Petitioner alleges that the state courts failed to consider his possible rehabilitation

10  as a mitigating circumstance. (Doc. 273 at 133.)

11         Again, the record clearly shows that the trial court and the Arizona Supreme Court

12  considered rehabilitation as a mitigating circumstance. At resentencing, Petitioner argued

13  that the court should consider his potential for rehabilitation as a mitigating circumstance,

14  and at the mitigation hearing Petitioner testified that he had no problems while

15  incarcerated and was not involved in any gang activity. (RT 8/27/96 at 32–33.) In his

16  special verdict, Judge Hancock noted that Petitioner "has had no difficulties since his

17  confinement at the state prison—he has tried to be a model inmate." (SER 141.) The

18  judge also specifically considered "the defendant's belief that he can be rehabilitated."

19  (*Id.*) He concluded, however, that the "mitigating circumstances are insufficient to

20  warrant leniency." (SER 144.)

21         The Arizona Supreme Court also considered the rehabilitation mitigating factor,

22  but found that it had not been proved:

23              We agree that Arizona recognizes the potential for
                rehabilitation as a mitigating factor. There appears no clear
24              test under Arizona law as to how a defendant might
                demonstrate ability to be rehabilitated. In cases in which this
25              court has substantively discussed the rehabilitation factor,
                defendants have offered evidence of potential for
26              rehabilitation in the form of expert testimony. None was
                offered here. Defendant's own testimony is not sufficient.
27              Judge Hancock considered defendant's testimony on the
                potential for rehabilitation and found it to be insufficient to
28              carry the burden of proof. We, too, have considered the
                defendant's testimony and find no reason to disturb Judge

                                       54

1
2

> Hancock's finding. The defendant thus fails to establish the
> factor by a preponderance of the evidence.

3    *White II*, 194 Ariz. at 351, 982 P.2d at 826 (citations omitted).

4    Petitioner contends that the Arizona Supreme Court mischaracterized the trial

5    court's ruling and erred by finding that Petitioner did not prove the rehabilitation factor.

6    The fact that Judge Hancock did not state that Petitioner failed to meet his burden of

7    proof on the factor does not render the Arizona Supreme Court's rejection of the claim

8    contrary to or an unreasonable application of clearly established federal law. As

9    discussed above, the clearly established federal law governing this claim includes *Lockett*

10   and *Eddings*, which require a sentencer to consider and give effect to all proffered

11   mitigation but do not direct a sentencer to consider the evidence in specific manner or

12   assign it a specific weight. Because the state courts did consider Petitioner's

13   rehabilitation argument, § 2254(d) precludes relief.

14              **3.      Claim 19**

15   Petitioner alleges that the state courts violated his right to equal protection of the

16   law by imposing a harsher sentence on him than on Susan Johnson when the only

17   significant difference between the defendants was their gender. (Doc. 273 at 135.) The

18   Arizona Supreme Court rejected this claim on direct appeal from resentencing. *White*

19   *II*, 194 Ariz. at 354, 982 P.2d at 829.

20   Clearly established federal law holds that "a defendant who alleges an equal

21   protection violation has the burden of proving 'the existence of purposeful

22   discrimination'" and must demonstrate that the purposeful discrimination "had a

23   discriminatory effect" on him. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting

24   *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on his equal

25   protection argument, Petitioner "must prove that the decisionmakers in *his* case acted

26   with discriminatory purpose." *Id.* Petitioner does not meet this burden because he and

27   Susan Johnson were not similarly situated.

28   The Arizona Supreme Court ruled that "[e]vidence justifying disparate treatment,

55

for reasons other than gender, is clear on this record." *White II*, 194 Ariz. at 354, 982 P.2d at 829. Specifically, the court noted that "the defendant and Susan were not similarly situated for the clear reason that White alone pulled the trigger that resulted in David Johnson's death." *Id.* at 353, 982 P.2d at 828.

In addition, Judge Hancock and the Arizona Supreme Court both rejected Petitioner's argument that he and Susan Johnson were similarly situated because they were both caring parents. As the Arizona Supreme Court explained:

> Judge Hancock's review of the evidence did not lead to a finding that White is a "caring father." Arizona law offers no clear test establishing the requirements of a "caring father" (or "caring mother"). Renewing contact and helping his daughter from prison is not the equivalent of "caring father." His own testimony demonstrates that of his six children he had no contact or association with the three youngest and of the other three he had very limited contact.

*Id.* at 353–54, 982 P.2d at 828–29.

Petitioner contends that the court "unreasonably discounted" this mitigating evidence on the basis of his gender. (Doc. 273 at 137.) However, he offers no support for this allegation.

Finally, in a further distinction between the defendants, all 12 jurors in Susan White's case recommended leniency. *White I*, 168 Ariz. at 514, 883 P.2d at 883.

Petitioner and Susan Johnson were not similarly situated. The Arizona Supreme Court considered Petitioner's equal protection argument and the supporting evidence and rejected the claim. This decision was neither contrary to nor an unreasonable application of clearly established federal law. Claim 19 is denied.

### 4. Claim 20

Petitioner alleges that the courts failed to consider the mitigating circumstance that the crime was "aberrant behavior." (Doc. 273 at 139.)

At resentencing, Petitioner asked the trial court to find, as a mitigating circumstance, that the killing of David Johnson represented aberrant behavior on

Petitioner's part. (SER 131–32.) In support of this argument, Petitioner pointed to his lack of a prior felony record or any record of abusive or violent behavior. (*Id.*) Judge Hancock acknowledged this aspect of Petitioner's record, along with his good behavior as an inmate, but rejected the aberrant behavior argument as "nonsensical." (SER 143.) The Arizona Supreme Court, noting that the concept was created by the Ninth Circuit in response to what it viewed as overly-rigid federal sentencing guidelines, held that "[t]here is no Arizona authority for 'aberrant behavior' as a mitigating factor, and we decline to adopt the doctrine on the facts of this case." *White II*, 194 Ariz. at 352, 982 P.2d at 827. The court also explained that under federal caselaw interpreting the doctrine, "even were we to accept [aberrant behavior] as a mitigator, defendant's behavior in the instant case would not qualify as 'aberrant behavior' for purposes of nonstatutory mitigation." *Id.* at 351, 982 P.2d at 826. The lack of a prior record is not synonymous with a criminal act being "aberrant behavior," and in Petitioner's case the murder was planned out and motivated by financial gain. *Id.* at 352, 982 P.2d at 826 (citing *United States v. Green*, 105 F.3d 1321, 1323 (9th Cir. 1997)).

The Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law. By declining to apply the concept of "aberrant behavior," the state courts did not, as Petitioner contends, fail to consider relevant mitigating evidence. To the contrary, Judge Hancock and the Arizona Supreme Court considered all of the factors that formed the basis of Petitioner's aberrant behavior claim, including the fact that Petitioner had experienced no difficulties since his confinement and attempted to be a model prisoner, had re-established contact with his children and assisted one of his daughters, and had accepted that he would spend the rest of his life in prison. *White II*, 194 Ariz. at 351, 982 P.2d at 826.

Claim 20 is denied.

### 5.   Claim 21

Petitioner alleges that he was denied his right to a fair sentencing when the Arizona Supreme Court found that the prosecutors' opinion that Petitioner should not

1    have been sentenced to death was insufficient as a mitigating circumstance to outweigh

2    the sole aggravating factor. (Doc. 273 at 140.) In his special verdict Judge Hancock stated

3    that the "opinion of Marc Hammond is irrelevant, carries no weight and is not a fact in

4    this case supporting a mitigating circumstance. The opinion of Jill Lynch is equally

5    irrelevant." (SER 142.) The Arizona Supreme Court held that Judge Hancock erred in

6    finding the prosecutors' recommendations irrelevant but nonetheless upheld the death

7    sentence:

8         The defendant is correct that Judge Hancock's statement is
          inconsistent with prevailing authority. The prosecutor's
9         opinion is relevant and should have been considered by the
          trial judge. But the opinions of Hammond and Lynch were
10        merely opinions. We have independently weighed these
          statements as factors of mitigation, both separately and
11        cumulatively, and conclude they are easily outdistanced by
          White's and Susan Johnson's premeditated scheme to murder
12        David Johnson and thereby reap the benefits of his life
          insurance. This is an expectation of pecuniary gain in the
13        most classic sense. It is akin to murder for hire.

14        We reaffirm the principle that a recommendation for leniency
          given by authorities intimately connected with the case
15        should be considered by the sentencer as a nonstatutory
          mitigating factor, and we are mindful of the argument by our
16        dissenting colleagues on this point, but in our view the
          financial gain factor on this record is so abundantly clear and
17        forceful that the opinion of the prosecutor is grossly
          insufficient to warrant a change in sentence under A.R.S. §
18        13-703.01.

19

20   *White II*, 194 Ariz. at 350–51, 982 P.2d at 825–26 (citations omitted).

21        Petitioner contends that the Arizona Supreme Court, by describing the pecuniary

22   gain aggravating factor as "so abundantly clear and forceful," assigned the factor more

23   weight than it was entitled to. (Doc. 273 at 142.) He argues that the court's "heightened

24   treatment of the pecuniary gain aggravator had a detrimental impact on its consideration

25   of all other mitigating circumstances," including the opinion of the prosecutor. (*Id.*)

26   Petitioner contends, "If the prosecutor's opinion were given appropriate weight and

27   considered jointly with the other mitigation evidence, it should certainly have been

28   sufficient to call for leniency when compared to the sole, weak aggravating factor." (*Id.*)

1      The manner in which the Arizona Supreme Court balanced the aggravating factor

2   against the mitigating evidence does not entitle Petitioner to habeas relief. Petitioner's

3   interpretation of the court's analysis is unconvincing. In characterizing pecuniary gain as

4   a "clear" and "forceful" aggravating factor, the Arizona Supreme Court simply described

5   the weight it assigned the factor in comparison to the prosecutor's opinion. *White II*, 194

6   Ariz. at 350–51, 982 P.2d at 825–26. Petitioner disagrees with the court's assessment of

7   the factor, but that assessment did not prevent the court from considering and giving

8   effect to any of the mitigation evidence. As described above, the sentencer may be given

9   "unbridled discretion in determining whether the death penalty should be imposed after it

10   has found that the defendant is a member of the class made eligible for that penalty."

11   *Zant*, 462 U.S. at 875; *see Marsh*, 548 U.S. at 175; *Harris*, 513 U.S. at 512.

12      Claim 21 is denied.

13      **6.**     **Claim 22**

14      Petitioner alleges that the Arizona Supreme Court deprived him of a fair

15   sentencing and due process when it affirmed his death sentence on independent review.

16   (Doc. 273 at 143.) Respondents contend that the court reasonably applied clearly

17   established federal law. (Doc. 275 at 77.)

18      Petitioner argues that in his first appeal the Arizona Supreme Court applied an

19   unconstitutional causal connection test to his mitigation evidence, including evidence of

20   his troubled childhood and history of substance abuse. In *White I*, the court

21   acknowledged that Petitioner "did not know his natural father, that his first stepfather was

22   an alcoholic, and that he was raised by his mother," but found that Petitioner's family

23   background was not a mitigating circumstance because Petitioner "failed to show that his

24   family background had anything to do with the murder he committed." 168 Ariz. at 512–

25   13, 815 P.2d at 881–82. The court noted that Petitioner "stated that he felt he had a

26   normal childhood and enjoyed growing up with his mother and stepbrother." *Id.* at 513,

27   815 P.2d at 882.

28      The court also found that Petitioner's "past heroin, cocaine and amphetamine use

and addiction is not a mitigating circumstance. Use of drugs is a mitigating circumstance only if the evidence shows that the drugs significantly impaired [Petitioner's] capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law at the time of the offense." *Id.* (citation omitted). The court noted that Petitioner "admitted that he has not used these drugs within the last ten years and that drugs were not a factor in the current offense." *Id.*

At resentencing the trial court "considered the following facts in mitigation . . . the defendant's natural father left home when defendant was 18 months old and defendant's first stepfather was an alcoholic; the defendant has dependent personality traits and admits to past heroin, cocaine and amphetamine abuse and addiction." (SER 141.)

In his opening brief in his second direct appeal, Petitioner specifically asked the Arizona Supreme Court to consider as mitigating circumstances his difficult family background and the other factors raised in his first direct appeal. (ROA 5 at 36.)[14] The Arizona Supreme Court in *White II* did not specifically address these circumstances. Therefore, according to Petitioner, the Arizona Supreme Court implicitly relied on the findings and conclusions from *White I* and failed to consider the evidence of a troubled childhood and substance abuse as mitigating circumstances. (Doc. 273 at 145; Doc. 276 at 55.) The Court disagrees.

As the Arizona Supreme Court explained, in reviewing Petitioner's sentence it "must . . . consider nonstatutory mitigators, including any aspect of the defendant's character or any circumstance of the offense relevant to determining whether a capital sentence is too severe." *White II*, 194 Ariz. at 349, 982 P.2d at 824 (citing A.R.S. § 13-703(G) and *Lockett*, 438 U.S. at 604).[15] The fact that the court did not expressly cite Petitioner's family background or drug use does not indicate that its decision violated

---

[14] "ROA" refers to the record on appeal from resentencing (Case No. CR-96-716-AP).

[15] Section 13-703(G) provides: "Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following [enumerated statutory mitigating factors]."

*Lockett* or *Eddings*. A sentencer "is not required to 'itemize and discuss every piece of evidence offered in mitigation.'" *Williams*, 441 F.3d at 1057 (quoting *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc). "It is sufficient that a sentencing court state that it found no mitigating circumstances that outweigh the aggravating circumstances." *Poland v. Stewart*, 117 F.3d 1094, 1101 (9th Cir. 1997) (citing *Parker v. Dugger*, 498 U.S. 308, 318 (1991)).

In *Allen v. Buss*, 558 F.3d 657, 667 (7th Cir. 2009), the Seventh Circuit held that the state supreme court did not clearly err in finding that the trial court properly considered evidence concerning the defendant's childhood. The trial court's sentencing order discussed a number of mitigating circumstances but omitted any discussion of Allen's traumatic childhood. *Id.* The order concluded that the court "finds no other circumstances appropriate for consideration as a mitigating factor." *Id.* Allen argued that trial court "did not consider (and therefore excluded) his traumatic childhood as an appropriate circumstance for consideration," in violation of *Eddings*. *Id.* The Seventh Circuit denied habeas relief, explaining that although "the sentencing order is somewhat cryptic, there is no statement in the sentencing order that expressly indicates that the sentencing court ignored Allen's childhood. Without that, it is plausible that the trial court's statement—that it found no other circumstances appropriate for consideration as a mitigating factor—means the trial court did not find Allen's childhood to be a 'mitigating' circumstance." *Id.*

In Petitioner's case, the trial court at resentencing explicitly considered the proffered mitigation evidence of a traumatic childhood and drug abuse. (SER 141.) The Arizona Supreme Court, citing *Lockett*, stated that it had considered "any aspect of the defendant's character or any circumstance of the offense relevant to determining whether a capital sentence is too severe." *White II*, 194 Ariz. at 349, 982 P.2d at 824. Nowhere in its opinion does the court state that it refused to consider any mitigating evidence. Because it was sufficient for the Arizona Supreme Court to say that it found no mitigating circumstances that outweighed the aggravating circumstances, Petitioner's

1   claim of a *Lockett/Eddings* violation is without merit. *Poland*, 117 F.3d at 1101.

2       Petitioner also argues that the Arizona Supreme Court's independent review of his

3   death sentence was unreasonable because the court failed to weigh all of the mitigating

4   evidence, including evidence of Petitioner's childhood and his history of substance abuse.

5   (Doc. 273 at 145.) He contends that the court did not perform a cumulative analysis of

6   mitigating circumstances, which also would have included Petitioner's good behavior and

7   acceptance of life in prison. (*Id*. at 146.)

8       Petitioner's argument is belied by the Arizona Supreme Court's opinion, which

9   clearly states that the court weighed the mitigating circumstances cumulatively. The court

10   first explained the process by which it considers mitigating evidence: "If more than one

11   mitigating factor is found, such factors are weighed both separately *and cumulatively*

12   against the evidence of aggravation." *White II*, 194 Ariz. at 350, 982 P.2d at 825

13   (emphasis added). The court then summarized its analysis in Petitioner's case:

14           Based on our independent review of the sentence imposed on

15           the defendant we conclude that the state has proved beyond a
        reasonable doubt the aggravating circumstance that Michael

16           Ray White murdered David Johnson in anticipation of
        substantial pecuniary gain. We further conclude, in view of

17           the calculated scheme which resulted in Johnson's death, that
        the mitigating factors raised by the defendant and discussed in

18           this opinion, whether viewed individually *or cumulatively*, are
        insufficient to warrant a mitigation of sentence. They neither

19           outweigh nor are they equal to the statutory aggravating
        circumstance present in this case. Defendant's capital

20           sentence is therefore affirmed.

21

22   *Id.* at 356, 982 P.2d at 831 (emphasis added).

23       The decision of the Arizona Supreme Court affirming Petitioner's death sentence

24   was neither contrary to nor an unreasonable application of clearly established federal law.

25   Claim 22 is denied.

26       **J.**    **Claim 23**

27       Petitioner alleges that his rights under the Eighth and Fourteenth Amendments

28   were violated by the policy of the Yavapai County Attorney's Office to pursue the death

penalty in every case where at least one aggravating circumstance may exist. (Doc. 273 at 147.)

Petitioner raised this constitutional challenge to the policy for the first time on appeal after resentencing. The Arizona Court denied the claim. *White II*, 194 Ariz. at 354, 982 P.2d at 829. The court found the claim was waived because Petitioner failed to raise it at his sentencing or during his PCR proceedings. The court also found the claim meritless:

> It would be inappropriate for this court to encroach on reasonable prosecutorial discretion, absent a clear indication of misconduct. Any one or more aggravating factors may warrant the death penalty as a matter of law. The actual sentencing decision, of course, resides with the court as part of the judicial process, and though the prosecutor may request the death penalty, the court is constitutionally required to weigh the evidence independently and to disagree with counsel whenever appropriate. The judicial process, whereby the aggravators and mitigators are analyzed and evaluated, normally provides ample protection against overreaching counsel.

*Id.*

Respondents contend that this claim is defaulted as waived. (Doc. 275 at 78.) Procedural status aside, the claim is clearly without merit.

The decision of the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable application of clearly established federal law. Prosecutors have wide discretion in making the decision whether to seek the death penalty, *see McCleskey*, 481 U.S. at 296–97, and the Ninth Circuit has rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." Smith, 140 F.3d at 1272.

Petitioner's reliance on *Zant v. Stephens and Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988), is misplaced. In *Lowenfield* the Court reiterated that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and compared to others found guilty of murder.'" 484 U.S. at 244 (quoting *Zant*, 462 U.S. at 877). Such a scheme must also provide an "objective, evenhanded, and substantively

63

rational way" for determining whether a defendant is eligible for the death penalty. *Zant*, 462 U.S. at 879. Arizona's sentencing scheme meets these criteria by allowing only specifically enumerated aggravating factors to be considered in determining eligibility for the death penalty. *See Lowenfield*, 484 U.S. at 244 (explaining that the use of specific "aggravating circumstances" is the accepted "means of genuinely narrowing the class of death-eligible persons and thereby channeling the [sentencer's] discretion"); *Blystone v. Pennsylvania*, 494 U.S. 299, 306–07 (1990) ("The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer].").

The principles announced in these cases do not support Petitioner's claim. The "concern of the [Supreme] Court has been to limit and channel the discretion of the sentencing body—i.e., the judge or the jury—which actually imposes the sentence in a given case." *Silagy v. Peters*, 905 F.2d 986, 993 (7th Cir. 1990) (citing *Pulley v. Harris*, 465 U.S. 37 (1984)). The prosecutor's role, by contrast, "is limited to that of initiating the proceedings." *Id.*

Clearly established federal law stands for the proposition that the statutory scheme for imposing a death sentence may not be unguided and arbitrary. Petitioner cites no authority that would extend this principle to limit the discretion of a prosecutor's office to set policies about when to seek the death penalty. Claim 23 is denied.

## K.    Claim 24

Petitioner alleges that Arizona's pecuniary gain aggravating factor violates the Eighth Amendment because it does not genuinely narrow the class of death-eligible offenders. (Doc. 273 at 150.) The Arizona Court rejected the claim. *White II*, 194 Ariz. at 355, 982 P.2d at 830. That decision was neither contrary to nor an unreasonable application of federal law. Petitioner relies on the dissent in *White II*, which stated that the "pecuniary gain aggravator covers such a wide range of behavior that it easily lends itself to uneven application." *Id* at 356, 982 P.2d at 831 (Zlaket, C.J., dissenting). The

Ninth Circuit, however, has rejected the argument that Arizona's pecuniary gain factor does not genuinely narrow the class of persons eligible for the death penalty. Williams v. Stewart, 441 F.3d 1030, 1059 (9th Cir. 2006). In Woratzeck v. Stewart, 97 F.3d 329, 335 (9th Cir. 1996), for example, the Ninth Circuit applied the principles set forth in Lowenfield, 484 U.S. at 244, to conclude that Arizona's pecuniary gain factor "sufficiently channels the sentencer's discretion." Claim 24 is denied.

### L.    Claim 27

Petitioner alleges that "Arizona's death penalty statute both on its face and as applied is categorically cruel and unusual punishment in violation of the Eighth Amendment." (Doc. 273 at 152.) He argues that the "Arizona death penalty scheme, taken as a whole, fails to genuinely narrow the class of persons eligible for the death penalty" and that the death penalty "as applied in his case serves neither the goal of retribution nor that of deterrence." (Id. at 153, 154.)

Petitioner raised this claim on appeal from resentencing. (SER 161.) He argued that the "death penalty is cruel and unusual under any circumstances . . . It is also cruel and unusual because it is irrational. It serves no purpose which is not adequately served by life imprisonment." (Id.) In addressing the claim the Arizona Supreme Court held that Arizona's death penalty statute "is not cruel and unusual on its face." 194 Ariz. at 355, 982 P.2d at 830. This decision is neither contrary to nor an unreasonable application of clearly established federal law. In Smith, 140 F.3d at 1272, the Ninth Circuit rejected the petitioner's challenges to the constitutionality of Arizona's death penalty, including allegations that Arizona's statute "does not properly narrow the class of death penalty recipients."

Petitioner contends that because the Arizona Supreme Court did not address his "as applied" argument, that portion of the claim is entitled to de novo review. (Doc. 273 at 152.) Under any standard of review, the claim does not entitle Petitioner to habeas relief. Referring to the social purposes of retribution and deterrence, see Gregg v. Georgia, 428 U.S. 153, 183 (1976), Petitioner asserts that "[e]mpirical evidence has

eroded these two justifications," and that at the time of Petitioner's sentencing "neither of these goals were met by the Arizona statute." (Doc. 273 at 154.) The Supreme Court has not accepted Petitioner's argument or overruled *Gregg*. See, e.g., *Hall v. Florida*, 134 S. Ct. 1986, 1992–93 (2014). Claim 27 is denied.

### M.    Claim 30

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth Amendment because it does not afford capital defendants an opportunity to voir dire the sentencing authority. (Doc. 273 at 154.) The Arizona Court rejected the claim on direct appeal, ruling that "defendant may not death-qualify the sentencing court." *White II*, 194 Ariz. at 356, 982 P.2d at 831.

Petitioner cites "no authority for the proposition that a defendant has a constitutional right to voir dire a judge, let alone to inquire about a judge's views on the death penalty." *Atwood v. Schriro*, 489 F.Supp.2d 982, 1059 (D. Ariz. 2007). The rule providing for inquiry into prospective jurors' views on capital punishment derives from the right to an impartial and unbiased jury under the Sixth and Fourteenth Amendments. *See Morgan v. Illinois*, 504 U.S. 719, 726 (1992). Trial judges are presumed to follow the law. *Walton v. Arizona*, 497 U.S. 639, 653 (1990), overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584 (2002); *see State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (explaining that mere possibility of bias or prejudice does not entitle a criminal defendant to voir dire the trial judge at sentencing). Because Petitioner has not shown that he has a constitutional right to voir dire a sentencing judge, the state court's refusal to recognize such a right is neither contrary to nor an unreasonable application of federal law.

### N.    Claim 33

Petitioner alleges that Arizona's capital sentencing statute violates the Eighth Amendment because it does not require the sentencing judge to consider all mitigating evidence cumulatively. (Doc. 273 at 157.) The Arizona Court rejected the claim on direct appeal, explaining that "[w]hile it is true the statute does not require cumulative weighing

of mitigators, this court has decreed that such weighing process be conducted." *White II*, 194 Ariz. at 355 n.3, 982 P.2d at 830.

In his special verdict Judge Hancock stated, "I have taken into account the aggravating and mitigating circumstances included in this special verdict. . . . I have considered the mitigating circumstances of A.R.S. 13-703(G) and any aspect of Mr. White's character or record and any and all circumstances of the offense relevant to a determination whether a sentence less than death would be appropriate in this case." (SER 144.)

The Arizona Supreme Court reviewed that decision, noted that the "trial court complied with this court's mandate with respect to the cumulative effect of the mitigating circumstances," and found "no reason to disturb the trial court's findings." *White II*, 194 Ariz. at 355, 982 P.2d at 830. The court also concluded its independent review of the death sentence by finding "the mitigating factors raised by the defendant and discussed in this opinion, whether viewed individually or cumulatively, are insufficient to warrant a mitigation of sentence." *Id.*

Petitioner contends that the Arizona Supreme Court misinterpreted the trial court's phrase "any and all." (Doc. 273 at 158.) According to Petitioner, because the phrase applied only to "the circumstances of the offense," Judge Hancock did not conduct a cumulative analysis of the mitigating circumstances. (Id.) This argument fails because Judge Hancock also stated that he had considered "any aspect of Mr. White's character or record" (SER 144) and because the Arizona Supreme Court undertook an independent cumulative analysis of the mitigating evidence.

## O.    Claim 46

Petitioner alleges that the State violated his Fifth and Fourteenth Amendment rights pursuant to *Miranda v. Arizona* when officers continued to question him after he asserted his right to an attorney. (Doc. 273 at 159.)

Prior to trial Petitioner moved to suppress his statements to law enforcement. After holding a suppression hearing the trial court concluded that proper Miranda warnings

67

were given and that Petitioner "waived his right to an attorney and was not promised any immunity or benefit." (SER 16.)

Petitioner did not raise this claim on direct appeal. Respondents contend that because the claim was not fairly presented in state court, it is procedurally defaulted and barred from federal review. (Doc. 275 at 83.) Petitioner does not contest this argument, and the Court agrees. (Doc. 276 at 69.) Claim 46 is denied as procedurally barred.

**P.     Claim 50**

Petitioner alleges that his due process rights are being violated because the trial court record is incomplete and therefore this Court cannot adequately review the alleged constitutional violations that occurred during his trial and sentencing. (Doc. 273 at 160.) As Respondents note (Doc. 275 at 83), Petitioner did not fairly present this claim on direct appeal in state court, and he does not assert cause and prejudice or a fundamental miscarriage of justice of excuse the default. Claim 50 is procedurally defaulted and barred from federal review.

**Q.     Claim 51**

Petitioner raises for the first time a claim that his right to be free from cruel and unusual punishment would be violated if the State executed him after he spent more than 20 years on death row. (Doc. 273 at 162.) The claim is both defaulted and meritless.

So-called Lackey claims, named after Justice Stevens' concurrence in the Supreme Court's denial of certiorari in *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of certiorari), are not supported by clearly established federal law. "The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006).  Claim  51  is denied.

**R.     Claim 53**

Petitioner alleges that the errors committed during his trial cumulatively violated his due process rights. (Doc. 273 at 164.) Respondents contend that the cumulative error doctrine is not clearly established federal law. (Doc. 275 at 84.)

While there is a circuit split on the question, *see Hooks v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012), the Ninth Circuit has held that "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle*, 505 F.3d at 928. The court explained that "cumulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 927 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); see *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) ("Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant.").

Petitioner is not entitled to relief on this claim. First, the Court has found no individual errors, so there is nothing to accumulate. *See Hayes v. Ayers*, 632 F.3d 500, 525 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."); *Mancuso*, 292 F.3d at 957 ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation.").

In addition, the combined effect of the alleged errors did not have a "substantial and injurious effect or influence on the jury's verdict" or render Petitioner's "defense far less persuasive than it might otherwise have been." *Parle*, 505 F.3d at 927 (quotations omitted); *see Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011). The evidence of Petitioner's guilt was strong, and any errors were harmless. *See id.* at 928 ("If the evidence of guilt is otherwise overwhelming, the errors are considered 'harmless' and the conviction will generally be affirmed."). Claim 53 is denied.

**S.      Claim 54**

Petitioner alleges that he "is being denied his due process rights and his right to be free from arbitrary punishment by having to litigate his federal habeas proceedings when

1   he is currently incompetent yet restorable." (Doc. 273 at 165.) Respondents contend, and

2   Petitioner acknowledges, that this is not a cognizable habeas claim because it does not

3   attack Petitioner's state court judgment as being in violation of the Constitution. (Doc.

4   275 at 85–86; Doc. 276 at 71.) Instead, it is "an equitable claim regarding the

5   fundamental fairness of the instant proceedings and [Petitioner's] ability to have his

6   conviction and sentence fairly reviewed." (Doc. 276 at 71.) Petitioner asks the Court to

7   "order the parties to discuss resolving the restoration issue and potential settlement if

8   restoration cannot occur." (Doc. 273 at 168.)

9          While habeas petitioners do not have a constitutional or statutory right to

10  competence, district courts retain the authority to issue limited competency-based stays.

11  *Gonzales,* 133 S. Ct. at 700, 709. Accordingly:

12              If a district court concludes that the petitioner's claim could
                substantially benefit from the petitioner's assistance, the
13              district court should take into account the likelihood that the
                petitioner will regain competence in the foreseeable future.
14              Where there is no reasonable hope of competence, a stay is
                inappropriate and merely frustrates the State's attempts to
15              defend its presumptively valid judgment.

16

17  *Id.* at 709.

18         Petitioner contends that his habeas claims could benefit from his assistance. (Doc.

19  273 at 166–67.) The Court disagrees. As previously discussed, under *Pinholster* this

20  Court's review of claims adjudicated on the merits is limited to the record before the state

21  court. *Pinholster*, 131 S. Ct. at 1398. Petitioner argues that his assistance is necessary for

22  Claims 1 and 15, alleging ineffective assistance of counsel, as well as Claims 8, 10, and

23  50. (Doc. 273 at 167; Doc. 276 at 72.) Each of those claims was adjudicated on the merits

24  in state court. "Any extrarecord evidence that [Petitioner] might have concerning these

25  claims would therefore be inadmissible." *Gonzales*, 133 S. Ct. at 709.

26  **IV.     Certificate of Appealability**

27         Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant

28  cannot take an appeal unless a certificate of appealability has been issued by an

70

appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 1(B). For the reasons stated in this order, the Court finds that reasonable jurists could not debate its resolution of the remaining claims.

## V.  CONCLUSION

Based on the foregoing,

**IT IS ORDERED:**

1. That Petitioner's Motion for Evidentiary Development (Doc. 277) is **DENIED**;

2. That Petitioner's Amended Petition for Writ of Habeas Corpus (Doc. 273) is **DENIED**, and the Clerk of Court shall enter judgment accordingly;

3. That the Stay of Execution entered by this Court on October 29, 2008 (Doc. 7) is **VACATED**;

4. That a Certificate of Appealability is **GRANTED** with respect to Claim 1(B), alleging ineffective assistance of counsel at sentencing, and **DENIED** as to the remaining claims; and

5. That the Clerk of Court shall forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 West Washington, Phoenix, Arizona 85007-3329.

Dated this 10th day of July, 2015.

Honorable Steven P. Logan
United States District Judge